35 A.3d 1177

MAY L. WALKER, ON BEHALF OF HERSELF AND ALL OTHERS SIMILARLY SITUATED, PLAINTIFF–APPELLANT, v. CARME-LO GIUFFRE, INDIVIDUALLY, CARMELO GIUFFRE, D/B/A BAY RIDGE AUTOMOTIVE MANAGEMENT CORP., ROUTE 22 AUTO SALES, INC., ROUTE 22 AUTOMOBILES, INC., HUDSON AUTO SALES, INC., FREEHOLD AUTO SALES, INC., FREE-HOLD AUTOMOTIVE LIMITED INC., AND FREEHOLD JEEP/EAGLE, INC., DEFENDANTS, AND ROUTE 22 NISSAN, INC., DEFENDANT–RESPONDENT.

BOBBIE HUMPHRIES, PLAINTIFF–APPELLANT, v. POWDER MILL SHOPPING PLAZA AND HOLLY GARDENS, INC., DEFENDANTS–RESPONDENTS.

Argued October 25, 2011—Decided January 25, 2012.

*Bruce D. Greenberg* argued the cause for appellant May L. Walker (*Lite DePalma Greenberg, Galex Wolf,* and *Mehri & Skalet,* attorneys; *Mr. Greenberg, Andrew R. Wolf,* and *Steven A. Skalet,* a member of the District of Columbia bar, on the briefs).

*Edward A. Kopelson* argued the cause for appellant Bobbie Humphries.

*Salvatore A. Giampiccolo* argued the cause for respondent Route 22 Nissan, Inc. (*McElroy, Deutsch, Mulvaney & Carpenter,* attorneys; *Mr. Giampiccolo* and *Lisbeth W. Cload* on the briefs).

*Joseph A. O'Neill* argued the cause for respondents Powder Mill Shopping Plaza and Holly Gardens, Inc. (*Garofalo & O'Neill,* attorneys).

*David A. Mazie* argued the cause for amicus curiae Consumers League of New Jersey (*Mazie Slater Katz & Freeman,* attorneys; *Adam M. Slater* on the brief).

*Lisa Manshel* and *Frederic J. Gross* submitted briefs on behalf of amicus curiae National Employment Lawyers Association–New Jersey (*Francis & Manshel* and *Frederic J. Gross Law Firm,* attorneys).

Justice HOENS delivered the opinion of the Court.

Courts in New Jersey have traditionally adhered to the American Rule as the principle that governs attorneys' fees. This guiding concept provides that, absent authorization by contract, statute or rule, each party to a litigation is responsible for the fees charged by his or her attorney. Fees charged by one's own attorney, of course, must comply with our Rules of Professional Conduct, *see RPC* 1.5, and fees awarded by courts, regardless of

their basis, are governed by principles of reasonableness, *see R.* 4:42–9; *see, e.g., Litton Indus., Inc. v. IMO Indus., Inc.,* 200 *N.J.* 372, 386, 982 *A.*2d 420 (2009) (commenting upon reasonableness in contract-based fee award).

Notwithstanding our continued adherence to the American Rule, there are numerous statutes that include fee-shifting provisions. Those statutes do not define the method for quantification of fees, but uniformly are in accord with the overarching principles of reasonableness that we have fixed. As a result, over time, we have provided guidance and direction to our courts to utilize in considering fee applications brought pursuant to fee-shifting statutes.

Today we are called upon to consider the principles that govern attorneys' fee awards arising from statutory fee-shifting provisions anew, and we do so in the context of two separate appeals. Each of these appeals raises a threshold challenge to the continued validity of the "contingency enhancement" that this Court first adopted nearly two decades ago in the context of a fee-shifting provision, *N.J.S.A.* 10:5–27.1, found in our Law Against Discrimination (LAD), *N.J.S.A.* 10:5–1 to –49; *see Rendine v. Pantzer,* 141 *N.J.* 292, 316–45, 661 *A.*2d 1202 (1995). Each appeal arises from the Appellate Division's decision that recent guidance from the United States Supreme Court rejecting contingency enhancements now precludes our courts from including them in awards made pursuant to any of our statutory fee-shifting provisions. *Walker v. Giuffre,* 415 *N.J.Super.* 597, 601, 2 *A.*3d 1165 (App.Div.2010) (citing and construing *Perdue v. Kenny A.,* — *U.S.* ——, 130 *S.Ct.* 1662, 176 *L.Ed.*2d 494 (2010)). Although the two appeals arise in the context of different fee-shifting statutes and although each confronts this Court with its own unique challenges, because they present one overarching question concerning the continuing validity of the *Rendine* approach, we have elected to consolidate them for the purpose of issuing this single opinion.

Having considered the arguments of the parties to these appeals concerning the continuing validity of the *Rendine* framework both

generally and as it relates to contingency enhancements, and having further considered the contrary approach to fee-shifting utilized by the United States Supreme Court in *Perdue*, we hold that the mechanisms for awarding fees, including contingency enhancements, that we adopted in *Rendine* shall remain in full force and effect as the governing principles for attorneys' fee awards made pursuant to fee-shifting provisions in our state statutes and rules. That holding notwithstanding, these appeals have made it apparent that some of the principles set forth in *Rendine* are in need of further explanation so that our trial courts may properly apply them and, in the process, create adequate records for review on appeal. We therefore both reiterate and explain the principles that shall henceforth govern such awards.

## I.

Although it is customary to begin opinions of this Court with a recitation of the facts, the procedural history and arguments raised in the particular dispute, we depart from that tradition today. Instead, because our analysis of the two disputes that we have elected to consolidate for purposes of this opinion rests largely on our resolution of the questions raised in the Appellate Division about *Rendine*, we begin our analysis there.

Well prior to the time when this Court decided *Rendine*, we had explained the purposes behind statutory fee-shifting provisions. *See Coleman v. Fiore Bros.*, 113 *N.J.* 594, 597, 552 *A.*2d 141 (1989). Relying principally on the legislative history that informed the enactment by Congress of the fee-shifting provision in the federal Civil Rights Act of 1976, P.L. 94–559 § 2, 90 Stat. 2641 (codified at 42 *U.S.C.A.* § 1988(b)), we identified three essential purposes for such statutes. *Ibid.* (quoting 122 Cong. Rec. 33,313 (1976) (statement of Sen. Tunney, sponsor of federal fee-shifting statute)). First, they are designed to address the "problem of unequal access to the courts." *Ibid.* Second, they are intended to provide the individuals, whose rights are being protected by the statutes, with the resources to enforce those rights in court. *Ibid.* Finally, they

operate so as to "[e]ncourag[e] adequate representation [which] is essential" to ensuring that those laws will be enforced. *Ibid.* In addition, we observed that fee-shifting provisions "are designed ... to promote respect for the underlying law and to deter potential violators of such laws." *Ibid.*

Those expressions of purpose, as we commented, *see ibid.*, are consonant with our understanding of the reasons that underlie the inclusion of fee-shifting provisions in similar statutes by our own Legislature. Although we found support in the federal statutes for our analysis of what our own Legislature intended when it included fee-shifting provisions in similar state statutes, we did not directly consider the mechanisms that govern the operation of those statutory fee-shifting provisions until we analyzed fee applications made in the context of two claims arising pursuant to our LAD. *See Rendine, supra,* 141 *N.J.* at 316, 661 *A.*2d 1202; *Szczepanski v. Newcomb Medical Ctr.,* 141 *N.J.* 346, 355–56, 661 *A.*2d 1232 (1995).

## A.

The framework we devised for calculating an award of fees pursuant to state statutory fee-shifting provisions is well-established, but the issues before us in these appeals require us to briefly reiterate that framework and, in particular, to explain the role that the contingency enhancement was intended to play. Making an award of attorneys' fees in the context of the LAD and similar state statutes begins with determining the lodestar,[1] a calculation that we described as "the most significant element in the award of a reasonable fee." *Rendine, supra,* 141 *N.J.* at 334–35, 661 *A.*2d 1202. Although the lodestar is essentially derived by multiplying the number of hours reasonably expended on the litigation by a reasonable hourly rate, *ibid.*, our opinion in *Ren-*

---

[1] Although there was considerable debate in the federal courts about the lodestar approach, by the time this Court decided *Rendine,* that matter had been settled. *See Rendine, supra,* 141 *N.J.* at 321–30, 661 *A.*2d 1202 (reviewing evolution of lodestar analysis in federal courts).

*dine* included specific guidance, consistent with the requirements of *RPC* 1.5(a), that informs both aspects of the lodestar equation.

In particular, we admonished trial courts "not [to] accept passively" the submissions of counsel, *Rendine, supra,* 141 *N.J.* at 335, 661 *A.*2d 1202, directing them instead to "evaluate carefully and critically the aggregate hours and specific hourly rates advanced by counsel for the prevailing party to support the fee application," *ibid.; see also Szczepanski, supra,* 141 *N.J.* at 366, 661 *A.*2d 1232 (holding that "a trial court should carefully and closely examine the lodestar-fee request to verify that the attorney's hours were reasonably expended").

The evaluation of hours expended includes several components, including a recognition that the focus must be on "the amount of time *reasonably* expended" rather than merely an acceptance of "the amount of time *actually* expended." *Rendine, supra,* 141 *N.J.* at 335, 661 *A.*2d 1202 (quoting *Copeland v. Marshall,* 641 *F.*2d 880, 891 (D.C.Cir.1980)) (emphasis in original). Moreover, we required the attorney seeking the fee award to prepare and provide a request in the form of a certification of services that is sufficiently detailed to enable the court to accurately calculate the lodestar. *Rendine, supra,* 141 *N.J.* at 337, 661 *A.*2d 1202 (citing *Lindy Bros. Builders, Inc. v. Am. Radiator & Standard Sanitary Corp. (Lindy I ),* 487 *F.*2d 161, 167 (3d Cir.1973)).

In that regard, although we did not require exactitude, we embraced the concept that "fairly definite information as to the hours devoted to various general activities . . . and the hours spent by various classes of attorneys" was essential for the court to analyze the fee request and to perform the lodestar calculation. *Ibid.* In *Rendine's* companion case, we further explained that "we would assume that applications for counsel fees invariably would be accompanied by contemporaneously recorded time records that fully support the calculation of hours expended by all attorneys who participated in the matter," *Szczepanski, supra,* 141 *N.J.* at 367, 661 *A.*2d 1232, and we permitted reliance on reconstructed records only in "exceptional" circumstances, *id.* at 368, 661 *A.*2d

1232. In particular, we explicitly observed that the trial court retains the "discretion to exclude from the lodestar calculation hours for which counsel's documentary support is marginal." *Ibid.; see also Rendine, supra,* 141 *N.J.* at 335, 661 *A.*2d 1202 (quoting *Rode v. Dellarciprete,* 892 *F.*2d 1177, 1183 (3d Cir.1990)).

In addressing the calculation of the lodestar, we further identified other circumstances that permit the trial court to reduce the hours that were expended. Although rejecting a strict proportionality rule, we cautioned our trial courts that "[f]ee-shifting cases are not an invitation to prolix or repetitious legal maneuvering. Courts should consider the extent to which a defendant's discovery posture, or a plaintiff's, has caused any excess expenses to be incurred." *Szczepanski, supra,* 141 *N.J.* at 366, 661 *A.*2d 1232. Therefore, a reduction may be appropriate if "the hours expended, taking into account the damages prospectively recoverable, the interests to be vindicated, and the underlying statutory objectives, exceed those that competent counsel reasonably would have expended." *Rendine, supra,* 141 *N.J.* at 336, 661 *A.*2d 1202. We also observed that the "trial court should reduce the lodestar fee if the level of success achieved in the litigation is limited as compared to the relief sought." *Ibid.*

Our decision in *Rendine* also articulated the principles that inform the calculation of a reasonable hourly rate, noting that it "is to be calculated according to the prevailing market rates in the relevant community" and should include an assessment of the "experience and skill of the prevailing party's attorneys and [a] compar[ison] . . . to the rates prevailing in the community for similar services" by comparable lawyers. *Id.* at 337, 661 *A.*2d 1202 (quoting *Rode, supra,* 892 *F.*2d at 1183). We directed trial courts to ensure that the hourly rate awarded is "fair, realistic, and accurate," allowing for adjustments to the requested rate when appropriate. *Ibid.* In another context, this Court described a reasonable hourly rate as being one "that would be charged by an adequately experienced attorney possessed of average skill and ordinary competence—not those that would be set by the most

successful or highly specialized attorney in the context of private practice." *Singer v. State*, 95 *N.J.* 487, 500–01, 472 *A.*2d 138, *cert. denied*, 469 *U.S.* 832, 105 *S.Ct.* 121, 83 *L.Ed.*2d 64 (1984).

### B.

As this Court made clear in *Rendine*, calculating the lodestar is not the end of the inquiry involved in fixing an appropriate award of fees. After the lodestar has been established, the trial court may increase the fee "to reflect the risk of nonpayment in all cases in which the attorney's compensation entirely or substantially is contingent on a successful outcome." *Rendine, supra*, 141 *N.J.* at 337, 661 *A.*2d 1202. This Court's authorization of a contingency enhancement arose from our conclusion that a fee award cannot be "reasonable" unless the lodestar is adjusted to reflect the actual risk that the attorney would not receive payment if the suit did not succeed. *Id.* at 338, 661 *A.*2d 1202. Because the appeals now before this Court call into question the continuing validity of our authorization in *Rendine* for awards of contingency enhancements, we must consider both the basis on which we first concluded that they were permitted and the manner in which our guidelines for such awards retain viability.

The consolidated appeals present this Court with a direct challenge to the continued viability of contingency enhancements that emanates from the United States Supreme Court's governing rubric for fee awards in the federal context. We turn, then, to an analysis of the competing state and federal principles that undergird this Court's traditional approach to the award of contingency enhancements and that, therefore, inform the central issue before the Court.

Well prior to the time when this Court issued the *Rendine* opinion, the federal courts had set forth their interpretation of the way in which fee awards arising from federal statutes should be calculated. The federal approach to the calculation of fee awards evolved over time, largely because the only benchmark for an award in the federal statutes was reasonableness.

The principal statutory authorization for fee awards enacted by Congress is found in the Civil Rights Act of 1976, 42 *U.S.C.A.* § 1988(b). Its language is spare, providing that "the court, in its discretion, may allow the prevailing party, other than the United States, a reasonable attorney's fee." *Ibid.* Although the statute itself provides no guidance concerning the manner in which a reasonable fee should be calculated, federal courts found assistance in the statute's legislative history. The Senate Report that accompanied the Civil Rights Act of 1976 referred with approval to a series of federal court opinions that had considered the general subject of awards of attorneys' fees. *S.Rep. No.* 94–1011, at 6 (1976), *reprinted in* 1976 *U.S.C.C.A.N.* 5908, 5913. As a result, those opinions soon came to be regarded as the framework for the federal courts to use in making their calculations of fee awards.

In particular, the Senate Report relied on an opinion in which the United States Court of Appeals for the Fifth Circuit had created standards for a fee award, describing that decision as identifying "[t]he appropriate standards." *Id.* at 5913 (citing with approval *Johnson v. Georgia Highway Express, Inc.,* 488 *F.*2d 714 (5th Cir.1974)). The *Johnson* framework for fixing a fee did not use a lodestar analysis, but instead listed twelve factors to be considered. *Johnson, supra,* 488 *F.*2d at 717–19. Because *Johnson* included among its twelve factors a consideration of "[w]hether the fee is fixed or contingent," it gave rise to a series of decisions in which some federal courts concluded that a contingency enhancement would be appropriate. *See, e.g., Copeland, supra,* 641 *F.*2d at 892; *Crumbaker v. Merit Sys. Prot. Bd.,* 781 *F.*2d 191, 196 (Fed.Cir.1986); *Northcross v. Bd. of Educ.,* 611 *F.*2d 624, 643 (6th Cir.1979).

When the question about the appropriate method for calculating counsel fees first reached the United States Supreme Court, it did not involve a contingency enhancement. *See Hensley v. Eckerhart,* 461 *U.S.* 424, 103 *S.Ct.* 1933, 76 *L.Ed.*2d 40 (1983). Rather, the Court first adopted the lodestar approach, *id.* at 433, 103 *S.Ct.*

at 1940, 76 *L.Ed.*2d at 50, which was an alternate method for calculating a fee award that had been "pioneered" in *Lindy I* by the United States Court of Appeals for the Third Circuit, *see Perdue, supra,* —— *U.S.* at ——, 130 *S.Ct.* at 1672, 176 *L.Ed.*2d at 504.

Turning to a consideration of the *Johnson* factors, the United States Supreme Court then addressed whether the lodestar could be enhanced or decreased based upon an analysis of the results obtained in the litigation. *Hensley, supra,* 461 *U.S.* at 434–37, 103 *S.Ct.* at 1940–41, 76 *L.Ed.*2d at 51–53. Because of that limited focus, the Court did not specifically consider the other *Johnson* factors. Instead, the Court commented that the lodestar could be enhanced by using some of them, but cautioned that not all would be appropriate because the twelve *Johnson* factors included some matters that were subsumed within the lodestar itself. *Id.* at 434 n. 9, 103 *S.Ct.* at 1940 n. 9, 76 *L.Ed.*2d at 51 n. 9.

The United States Supreme Court next addressed the question of fee calculations in the context of rejecting enhancements to the lodestar for considerations about novelty and complexity as well as quality of representation. Reasoning that the former were part of the reasonable hours and the latter would be reflected in a reasonable hourly rate, the Court concluded that they were adequately reflected in the lodestar calculation and that an enhancement would be duplicative. *Blum v. Stenson,* 465 *U.S.* 886, 898–99, 104 *S.Ct.* 1541, 1549, 79 *L.Ed.*2d 891, 902 (1984). The Court specifically reserved the issue of the propriety of the *Johnson* factor relating to a contingency enhancement for the future. *Id.* at 901 n. 17, 104 *S.Ct.* at 1550 n. 17, 79 *L.Ed.*2d at 903 n. 17.

When the United States Supreme Court directly considered whether the lodestar could be subject to a contingency enhancement, the Justices split three ways, with the result that there was no clear majority view. *Pennsylvania v. Delaware Valley Citizens' Council for Clean Air (Delaware Valley II),* 483 *U.S.* 711, 107 *S.Ct.* 3078, 97 *L.Ed.*2d 585 (1987). The Court's plurality, consisting of four Justices, reasoned that Congress had not explic-

itly authorized such an enhancement. *Id.* at 723–25, 107 *S.Ct.* at 3085–87, 97 *L.Ed.*2d at 596–98. Because in their view a contingency enhancement is related to the risk of a loss, they found no basis in the statute to permit such an award. *Id.* at 727, 107 *S.Ct.* at 3088, 97 *L.Ed.*2d at 599. Further, the Justices in the plurality concluded that because there is always uncertainty in litigation, a contingency enhancement, at least in theory, would become a routine part of an award, contrary to the statute's design. *Id.* at 725, 107 *S.Ct.* at 3086, 97 *L.Ed.*2d at 597.

Justice O'Connor concurred in the judgment, but did not entirely foreclose the possibility of a contingency enhancement. *Delaware Valley II, supra,* 483 *U.S.* at 730–31, 107 *S.Ct.* at 3089–90, 97 *L.Ed.*2d at 601 (O'Connor, J., concurring in part). Instead, she proposed a two-part test that would govern such enhancements, using an analysis of the market realities of contingent fee cases coupled with evidence that the party would have faced "substantial difficulties" in attracting counsel absent the availability of a contingent fee arrangement. *Id.* at 731–33, 107 *S.Ct.* at 3090–91, 97 *L.Ed.*2d at 601–03. Finally, Justice Blackmun, joined by three others, dissented, arguing that a contingency enhancement was necessary to ensure that plaintiffs would be able to attract competent counsel. *Delaware Valley II, supra,* 483 *U.S.* at 735–42, 107 *S.Ct.* at 3091–95, 97 *L.Ed.*2d at 604–08 (Blackmun, J., dissenting).

By the time that this Court issued its opinion in *Rendine,* however, the United States Supreme Court had directly confronted the propriety of a contingency enhancement and, over a strong dissent, had rejected it. *See City of Burlington v. Dague,* 505 *U.S.* 557, 112 *S.Ct.* 2638, 120 *L.Ed.*2d 449 (1992). In *Dague,* the Court referred to the lodestar analysis as "the guiding light of our fee-shifting jurisprudence ... [and to the] strong presumption that the lodestar represents the reasonable fee[.]" *Id.* at 562, 112 *S.Ct.* at 2641, 120 *L.Ed.*2d at 456 (internal citations and quotations omitted). Commenting that there is a burden on one who seeks an enhancement to demonstrate that it is "necessary," *ibid.* (quoting *Blum, supra,* 465 *U.S.* at 898, 104 *S.Ct.* at 1541, 79 *L.Ed.*2d at

891), the Court held that enhancing the lodestar because a case was taken on a contingent fee basis was inappropriate. In the process, the majority rejected, as impossible to apply, the middle ground approach advocated by Justice O'Connor, *see id.* at 563–65, 112 *S.Ct.* at 2642, 120 *L.Ed.*2d at 457–58, and, as inconsistent with the lodestar analysis, the position urged by the dissent that awards of contingency enhancements should be permitted, see *id.* at 562–63, 112 *S.Ct.* at 2641–42, 120 *L.Ed.*2d at 456–57.

The United States Supreme Court's decision in *Dague* therefore not only settled the question about the methodology of fee award calculations in cases arising under federal fee-shifting statutes, but it thoroughly identified the reasons both for and against the inclusion of a contingency enhancement. As a result, those arguments were well developed when this Court decided *Rendine.*

## C.

As part of the analysis in *Rendine,* this Court identified the competing strands in the United States Supreme Court's approach to contingency enhancements. We did so because of the peculiar procedural posture in which that appeal was presented to this Court. The trial court in *Rendine* had made its fee award in accordance with Justice O'Connor's analysis in *Delaware II*, which the trial court considered to be the prevailing authority from the United States Supreme Court. *See Rendine, supra,* 141 *N.J.* at 319–20, 661 *A.*2d 1202. After the United States Supreme Court rejected contingency enhancements in *Dague,* the defendant sought reconsideration. In declining to follow *Dague,* the trial court in *Rendine* concluded that, if asked, this Court would not embrace it. *Id.* at 321, 661 *A.*2d 1202.

As a result of that historical context, all of the federal precedents, including the United States Supreme Court's decision in *Dague,* were squarely presented and considered when this Court decided *Rendine. See id.* at 316–33, 661 *A.*2d 1202. As part of that analysis, we commented on the approaches taken by several of the United States Circuit Courts of Appeals that had concluded

that contingency enhancements were appropriate, as well as on the numerous scholarly commentaries that favored that approach. *Id.* at 330–33, 661 A.2d 1202. In clear and unmistakable terms, this Court rejected the framework adopted by the United States Supreme Court in *Dague.* In its place, we held that courts making attorneys' fee awards based on state statutory fee-shifting provisions, "after having carefully established the amount of the lodestar fee, should consider whether to increase that fee to reflect the risk of nonpayment in all cases in which the attorney's compensation entirely or substantially is contingent on a successful outcome." *Id.* at 337, 661 A.2d 1202.

Although we recognized that enhancements raise legitimate concerns about the possibility of overpayment and double counting, we found the arguments for outright rejection of contingency enhancements unpersuasive, *id.* at 338–39, 661 A.2d 1202, and opted instead to address the concerns through the adoption of the standards that we fixed to guide courts in awarding contingency enhancements, *id.* at 339, 661 A.2d 1202. That is, we did not leave the award of contingency enhancements to chance or whim, but established guidelines that were designed to effectuate the purposes that statutory fee-shifting provisions are intended to advance.

In particular, we fixed the ordinary range for a contingency enhancement as being between five and fifty percent and we also identified the typical range as being between twenty and thirty-five percent of the lodestar. *Id.* at 343, 661 A.2d 1202. Although we left open the possibility of an enhancement of one hundred percent, we reserved it for the "rare and exceptional case," *ibid.,* which we further described as one "in which no prospect existed for the attorney to be compensated by payment of a percentage of a large damages award, and in which the relief sought was primarily equitable in nature," *ibid.* Significantly, we precluded an award of a contingency enhancement in excess of one hundred percent. *Ibid.*

In addition to those guidelines, we noted that there are other factors that bear upon the selection of the appropriate contingency award. We observed that we were persuaded by the position of the dissent in *Delaware Valley II,* which advocated that, in evaluating a contingency enhancement, "a court's job simply will be to determine whether a case was taken on a contingent basis, whether the attorney was able to mitigate the risk of nonpayment in any way, and whether other economic risks were aggravated by the contingency of payment." *Rendine, supra,* 141 *N.J.* at 339, 661 *A.*2d 1202 (quoting *Delaware Valley II,* 483 *U.S.* at 747, 107 *S.Ct.* at 3098, 97 *L.Ed.*2d at 612 (Blackmun, J., dissenting)). We observed that courts may also consider such questions as the strength of the claim, proof problems, and the likelihood of success, because all of those may operate as disincentives to attorneys that the fee-shifting mechanism is designed to counteract. *Id.* at 340–41, 661 *A.*2d 1202.

As part of our analysis, we recognized that these awards are only available in those cases that our Legislature has selected for statutory fee-shifting so as to achieve its broader public policy purposes of attracting counsel to socially beneficial litigation. We implicitly permitted consideration of the nature of the underlying dispute through our conclusion that the highest end of the permissible range for a contingency enhancement is appropriate for cases in which the relief sought was primarily equitable in nature. *See id.* at 343, 661 *A.*2d 1202.

We observed that the "extraordinary volume of federal litigation on the question of contingency enhancements ... demonstrates the need for a clear rule, one that can readily and definitively be applied by trial courts, a rule that will end, not perpetuate, litigation of the issue." *Id.* at 334, 661 *A.*2d 1202. We did not merely express the hope that by adopting guidelines, appellate intervention to adjust contingency enhancements would be infrequent, *id.* at 345, 661 *A.*2d 1202, but attempted to create guidelines of sufficient clarity that we could prevent idiosyncratic or unjustified awards. Applying those guidelines in *Rendine* itself, we

exercised our original jurisdiction to decrease the contingency enhancement from one hundred percent to thirty-three-and-one-third percent as an example of the appropriate application of the factors we had identified. *Id.* at 344–45, 661 *A.*2d 1202.

It is in this context that we consider the United States Supreme Court's decision in *Perdue.* This most recent pronouncement on the subject of awards of attorneys' fees, which formed the lynchpin for our Appellate Division's rejection of the fee awards in both of the matters now on appeal, breaks no new ground. Indeed, the opinion itself does not regard the six important rules it identifies as new, but describes them as having been established in the Court's prior decisions. *Perdue, supra,* —— *U.S.* at ——, 130 *S.Ct.* at 1672, 176 *L.Ed.*2d at 505.

The precise inquiry in *Perdue* was the application of these six important rules in the context of an enhancement based on either the quality of an attorney's performance or the results achieved, *see id.* at ——, 130 *S.Ct.* at 1673–74, 176 *L.Ed.*2d at 506, an issue not directly relevant to the question raised here. Although in applying those rules to the particular award then being reviewed the Court reiterated that a contingency enhancement is not permitted, *see id.* at ——, 130 *S.Ct.* at 1676, 176 *L.Ed.*2d at 509, the opinion made it abundantly clear that, for federal fee-shifting purposes, this issue had been settled in *Dague, ibid.* Simply put, the Court's decision in *Perdue* reiterates the framework that applies to fee awards in federal courts arising from federal statutes and does not represent any new approach on the subject.

■ More to the point, there are no decisions relied upon in *Perdue* that were not considered, and rejected, by this Court in *Rendine.* There is, in the end, nothing in this most recent pronouncement of the United States Supreme Court that causes us to vary from the approach we have previously adopted. Although an award of attorneys' fees pursuant to a federal fee-shifting statute would be required to comply with the guidance from the United States Supreme Court, awards made pursuant to fee-shifting statutes enacted by our Legislature must instead

continue to conform to the principles announced in *Rendine*. To the extent that the two panels of the Appellate Division held in the cases now on appeal that our trial courts should instead apply the federal model for fee calculations, the panels erred.

## II.

With this analytical framework to guide us, we turn to a discussion of the two matters before this Court on appeal.

### *Walker v. Giuffre, A–72–10*

On December 3, 2001, plaintiff May L. Walker purchased a new car from defendant Route 22 Nissan. Because she financed part of the purchase price, Walker signed a separate retail installment contract. That document identified certain charges as being "Amount Paid to Others on Your Behalf," and included an item labeled "Regis. Fee, Transfer & New Plates," which referred to a $140 documentary service fee. At the time of the transaction, the New Jersey Motor Vehicle Commission charged only $88.50 to transfer license plates and for registration, which meant that the dealership collected, but did not itemize, an additional $51.50 to obtain Walker's title, registration, and license plates for her.

On April 25, 2003, Walker filed a complaint against Route 22 Nissan, its owner, defendant Carmelo Giuffre, six other car dealerships also alleged to be owned by Giuffre, and Bay Ridge Automotive Management Corp., Giuffre's New York corporation. The complaint included three essential claims. First, Walker alleged that the registration fee violated the Consumer Fraud Act (CFA), *N.J.S.A.* 56:8–1 to –20, and the Truth–in–Consumer Contract, Warranty and Notice Act (TCCWNA), *N.J.S.A.* 56:12–14 to –18. Second, she challenged a $199 "Documentary Fee" charged by Route 22 Nissan because, although it was itemized, the amount was not reasonably related to the actual cost of the transaction's documents. Third, she asserted that the forms used by the car dealer failed to provide adequate notice of either fee because they were not presented in the "ten-point bold face type" required by the regulations promulgated pursuant to the TCCWNA.

Plaintiff sought to proceed on behalf of a class of similarly situated individuals and retained attorneys affiliated with two law firms to represent her. Defendants other than Route 22 Nissan contended that Walker could not maintain a claim against them for herself or on behalf of a class and sought dismissal from the litigation. Walker's attorneys then pursued extensive discovery in their attempt to demonstrate that there were sufficient relationships among defendants to withstand dismissal.

Prior to the time when Walker's complaint was filed, Route 22 Nissan had been named as a defendant in a Bergen County class action alleging virtually identical deceptive practices. *See Cerbo v. Ford of Englewood, Inc.*, No. BER–L–2871–03 (Law Div. April 17, 2003). The *Cerbo* litigation was far more expansive, naming hundreds of defendants, including nearly every automobile dealer in New Jersey, and purporting to make claims on behalf of more than two million class members. Although she was not aware of it at the time, Walker was already included within the *Cerbo* class when she filed her complaint. She and defendants pursued discovery in her separate litigation and they remained part of the *Cerbo* class action, participating in that litigation until the parties in *Cerbo* reached a tentative settlement in May 2005. Walker, believing that the terms of the proposed settlement were inadequate, then elected to opt out of the *Cerbo* class.

At that point, Walker formally moved to certify a class in her separate litigation. Defendants cross-moved for a stay or for dismissal of the claims against all of the dealerships other than Route 22 Nissan, arguing again that Walker could not serve as a representative of any class relating to entities with which she had not done business. The trial court certified a class only as to Route 22 Nissan, but stayed the matter pending the resolution of the proposed *Cerbo* settlement. *See R.* 4:32–4 (deleted 2006, text incorporated in *R.* 4:32–2(e)) (requiring court approval of class action settlement); *Incollingo v. Canuso*, 297 *N.J.Super.* 57, 60, 687 *A.*2d 778 (App.Div.1997); *Chattin v. Cape May Greene, Inc.*, 216 *N.J.Super.* 618, 626–27, 524 *A.*2d 841 (App.Div.1987). After

the *Cerbo* settlement was approved on January 25, 2006, the trial court granted defendant's motion to decertify Walker's class.

On August 3, 2006, Walker moved for partial summary judgment, arguing that the excessive registration fees and inadequate font size violated both the CFA and the TCCWNA and their applicable regulations. Defendant cross-moved for summary judgment, arguing that Walker's claims were preempted because it disclosed and itemized its fees, thus complying with the Federal Truth in Lending Act (TILA), 15 *U.S.C.A.* §§ 1601–1667f, and because the font size was adequate. The trial court granted Walker's motion for partial summary judgment, finding that by not itemizing the $51.50 component of the documentary service fee, Route 22 Nissan had violated the application regulation, *see* *N.J.A.C.* 13:45A–26B.2(a)(2)(i), and that Walker had thereby sustained an ascertainable loss.

Concluding that the regulatory violation was a *per se* violation of the CFA, *see Cox v. Sears Roebuck & Co.*, 138 *N.J.* 2, 18–19, 647 *A.*2d 454 (1994), the court then trebled that amount, *see N.J.S.A.* 56:8–19. Moreover, the trial court found that by failing to itemize the $51.50 charge, Route 22 Nissan had also violated the TCCWNA, as a result of which the court imposed a $500 civil penalty, for a total damage award of $654.50 in Walker's favor. However, the trial court denied Walker's alternate claim for relief, finding that the inadequate font size, *see N.J.A.C.* 13:45A–26B.2(a)(2)(iii), did not cause an ascertainable loss, *see Thiedemann v. Mercedes–Benz*, 183 *N.J.* 234, 238, 252–53, 872 *A.*2d 783 (2005) (holding that CFA requires proof of "ascertainable loss," necessitating that plaintiff show specific proof of quantifiable loss). The trial court denied defendant's cross-motion for summary judgment, rejecting its TILA preemption argument in its entirety.

Because plaintiff had prevailed on her individual claims, the trial court concluded that she was entitled to a fee award. Walker had been represented throughout by attorneys employed by the two different law firms, who jointly filed their fee request, seeking $703,605.09 in counsel fees and $27,562.43 in costs. Defendant

opposed the application on several grounds. First, defendant argued that Walker's attorneys failed to sufficiently explain or categorize the time records that supported their billings, thus falling short of the specificity required by *RPC* 1.5(a). Second, defendant objected to the hourly rates being requested, pointing out that they were supported only by an article about hourly rates used by a few of the largest and most prestigious firms in the country, and bore no relationship to the reasonable rates charged here in New Jersey. Third, Route 22 Nissan argued that Walker's attorneys had received a counsel fee award in the *Cerbo* settlement which covered much of the work they included in their fee request in Walker's litigation, rendering the application moot or substantially duplicative.

The trial court addressed these arguments in a series of written opinions. First, based on its *in camera* review of documents relating to the *Cerbo* fee agreements, the trial court determined that defendant was entitled to limited discovery, but suggested that plaintiff's attorneys could avoid disclosing the *Cerbo* agreements if they credited defendants with the entire amount paid to them as attorney's fees in the *Cerbo* settlement. Second, after Walker's attorneys agreed to the credit for sums received in the *Cerbo* settlement, the trial court agreed with defendant that it was entitled to pursue limited discovery to attempt to allocate the time Walker's attorneys asserted that they had spent on the litigation as among several categories, some compensable and others that should be excluded. In response to the court's directive, Walker's attorneys resisted any discovery, asserting that they were either completely unable to segregate their billing records into categories, or that their effort to do so had been "very difficult" and time-consuming.

Faced with the dilemma caused by this unusual state of affairs, the trial court reasoned that Walker's attorneys had been appropriately compensated, through the fee award in *Cerbo*, for all of their work through the time when the Walker class was decertified. Turning to the remainder of the fee request, the trial court

set a lodestar of $68,450 by analyzing, to the best of its ability, the reasonable number of hours expended by each of the attorneys from the two law firms representing Walker. Although the court's written decision is not detailed, as part of its review of the un-categorized billing records, the court referred to the relevant factors, *see RPC* 1.5(a), adjusted the hours to account for duplication of effort among counsel and the modest recovery achieved, *see New Jerseyans for a Death Penalty Moratorium v. N.J. Dep't of Corr.*, 185 *N.J.* 137, 154, 883 *A.*2d 329 (2005), but utilized the hourly rates requested by plaintiff's counsel.

Having determined that the lodestar amount thus fixed was fair and reasonable, the trial court applied a forty-five percent contingency enhancement, resulting in a final fee award of $99,252.50. After a brief recitation of the *Rendine* guidelines concerning contingency enhancements, the trial court described its choice of a forty-five percent enhancement as "fully warranted" noting as its only explanation that the "history of this case . . . can hardly be classified as 'typical.' "

Defendant appealed, challenging the trial court's ruling "in all respects," and Walker cross-appealed the order that decertified her class. In a published opinion, the Appellate Division affirmed in part, reversed in part, and remanded for reconsideration of the award of counsel fees. *Walker, supra,* 415 *N.J.Super.* at 601, 2 *A.*3d 1165.

The appellate panel affirmed the trial court's judgment on liability, on the damages awarded under the CFA, on the civil penalty imposed under the TCCWNA, and on the class decertification. *Id.* at 601, 605, 610–11, 2 *A.*3d 1165. The panel reversed and vacated the award of counsel fees to Walker's attorneys, and remanded "for reconsideration in light of prevailing legal standards." *Id.* at 610, 2 *A.*3d 1165. Its decision to remand rested on three separate bases.

First, although the Appellate Division agreed that the trial court properly applied the fee awarded in *Cerbo* to cancel out any fees to which Walker's attorneys would have been entitled for work

performed before the *Cerbo* settlement was approved and the class in *Walker* decertified, the Appellate Division found the trial court had effectively allowed Walker's attorneys to avoid entirely their obligation to justify their fee application as it related to work performed thereafter. *Id.* at 606–07, 2 *A.*3d 1165. Reasoning that the trial court could "not relieve counsel of the responsibility of justifying the fees requested here by connecting the hours utilized to the claims that were successfully prosecuted," the panel reversed.[2] *Id.* at 607, 2 *A.*3d 1165.

Second, the Appellate Division reversed the counsel fee award because it concluded that the trial court's analysis of the reasonableness of the hourly rate was lacking. The appellate panel pointed out that the only support for agreeing with the hourly rate requested by Walker's attorneys was the trial court's observation that:

> I have handled a significant number of class actions and ruled on a number of fee requests. The fees requested in this case are generally consistent with what I have seen and awarded in the past. In my opinion, they are reasonable.
>
> [*Id.* at 607, 2 *A.*3d 1165.]

The Appellate Division found this analysis lacking because it reflected "[t]he personal opinion of a trial judge predicated solely on his or her own professional experiences [which] does not satisfy the analysis required by the Court under *Rendine* to determine a reasonable hourly rate." *Ibid.*

---

[2] By our limited grant, we left undisturbed the Appellate Division's conclusion that the lodestar calculation was flawed because the trial court essentially relieved counsel of the obligation to support the request for attorneys' fees for the period following the settlement in *Cerbo* and the decertification of the class in accordance with the strictures imposed in *Rendine*. *See Rendine, supra,* 141 *N.J.* at 335, 661 *A.*2d 1202. On remand, the challenge to counsel may well be a daunting one, serving to caution all counsel engaged in fee-shifting litigation. In the future, counsel would be wise to record their time entries with sufficient care and precision that the trial courts will be able to perform the lodestar calculation in accordance with our admonitions in *Rendine* and *Szczepanski*. *See* discussion *supra* Part I.C; *Rendine, supra,* 141 *N.J.* at 337, 661 *A.*2d 1202; *Szczepanski, supra,* 141 *N.J.* at 366, 661 *A.*2d 1232.

Third, the Appellate Division reversed the counsel fee award, concluding that the trial court's "declaratory statement" that the forty-five percent contingency enhancement was justified because the "history of this case ... can hardly be classified as 'typical,'" was "devoid of analytical support." *Id.* at 608, 2 *A.*3d 1165. As part of its analysis of that aspect of the trial court's fee award, the Appellate Division also reasoned that it fell short as compared to the United States Supreme Court's decision in *Perdue*. *Ibid.* (citing *Perdue, supra,* —— *U.S.,* ——, 130 *S.Ct.* 1662, 176 *L.Ed.*2d 494). Observing that *Perdue* "had not been decided when [the trial judge] made his ruling," *Walker, supra,* 415 *N.J.Super.* at 608 n. 2, 2 *A.*3d 1165, the panel reasoned that the trial court's analysis was "inconsistent with [this] most recent decision of the United States Supreme Court setting the standard for fee enhancement in fee-shifting cases," *id.* at 608, 2 *A.*3d 1165.

In sum, the Appellate Division reversed the fee award both because the trial court's "assessment of the reasonableness of the fees requested here, based only on the judge's personal experiences, undermines our appellate review," and because it concluded that the trial court should apply the factors outlined by the United States Supreme Court in *Perdue*. *Id.* at 610, 2 *A.*3d 1165.

The parties cross-petitioned for certification, and we granted only that aspect of Walker's petition that is "limited to the issue of the enhancement of the attorney fee award." 205 *N.J.* 98 (2011). We thereafter granted leave to the Consumers League of New Jersey and the National Employment Lawyers Association of New Jersey to participate as amici curiae.

In light of the limited nature of our grant of certification, we need only address the Appellate Division's reversal of the trial court's award of the forty-five percent contingency enhancement. The panel's decision concerning the contingency enhancement had two aspects, each of which demands different analysis from this Court on appeal.

██ First, we fully concur with the panel's conclusion that the trial court failed to sufficiently address the factors or the framework that we established in *Rendine* to guide the selection of the appropriate percentage to use as a contingency enhancement. In particular, the trial court on remand should take care to explain how the contingency enhancement it selects comports with the usual and typical ranges for such enhancements that we identified in *Rendine* and how it advances the goals that we discerned our Legislature intended to achieve through the fee-shifting mechanism.

Second, however, as our explanation of the evolution of the law surrounding contingency enhancements makes clear, we reject the Appellate Division's conclusion that the *Rendine* framework for evaluating attorneys' fee awards made pursuant to state statutory fee-shifting provisions has been altered in any way by the United States Supreme Court's *Perdue* decision. On the contrary, we reiterate that the considerations we identified in *Rendine* remain those that guide the analysis of fee-shifting provisions found in our statutes.

*Humphries v. Powder Mill Shopping Plaza, A–100–10*

Plaintiff Bobbie Humphries suffered a spinal cord injury in 1973. Ever since that time, she has used a motorized wheelchair. She drives a specialized van that is equipped with a wheelchair platform lift, which enables her to regularly patronize pharmacies, groceries, restaurants and various other business establishments.

Defendant Holly Gardens Inc. owns the Powder Mill Complex, which is located in Parsippany. The complex includes defendant Powder Mill Shopping Plaza and the adjacent Powder Mill Corporate Park. The complex is served by parking areas located on two levels where there are a total of 545 parking spaces. There are ninety-four parking spaces in front of the main entrances to the retail stores in the Shopping Plaza and on the west side of the shopping center, four of which are accessible parking spaces.

In the spring of 2005, Humphries went to the Shopping Plaza to patronize a restaurant. Although there were van accessible

spaces at the east end of the lot, the ramp up to the sidewalk was too steep for her to safely use with her wheelchair. She was only able to gain access to the restaurant because her brother set up a portable ramp for her and she complained to the owner of the restaurant about the unsafe ramp.

Although Humphries did not know it at the time, the Shopping Plaza had already received a similar complaint. On April 28, 2005, Juanita Rose, the outreach and advocacy coordinator for Disabled Advocates Working for Northwest (DAWN), a local independent living center which serves people with disabilities, had complained that there were insufficient handicap accessible parking spaces and curb cuts in front of a bank that is also located in the Shopping Plaza. DAWN had requested that the parking lot be brought into compliance with the Americans with Disabilities Act Accessibility Guidelines (ADAAG).

On May 5, 2005, counsel for defendants responded that his clients were "not unsympathetic with the goals of" DAWN, but declined to address its complaints. He wrote instead that

the complex was built many years ago, pursuant to laws and approvals in effect at that time. None of the changes you suggest can be made without substantial time, effort, expense and, ultimately governmental approvals.

On June 15, 2005, Edward Kopelson, an attorney who had been retained by DAWN, responded, outlining the claimed deficiencies by noting that the Shopping Plaza's parking lot contained

too few handicap parking spaces, inadequate signage at existing handicap parking spaces, improper location of handicap parking spaces, absence of accessibility signage, and inadequate access to the stores at the complex including a broken-up curb ramp at the west end and a suicide ramp [that is, a ramp with an incline that exceeds that permitted by the ADAAG] at the east end of the Plaza.

Kopelson further suggested that the reference to the property's age would not be a sufficient defense were he to file a complaint based on Title III of the Americans with Disabilities Act (ADA), 42 *U.S.C.A.* §§ 12181–12189, or the LAD. He demanded that defendants promptly remedy the conditions and warned that, if necessary, a lawsuit would be filed to compel remediation.

Although a letter dated the next day from defendants' counsel advised that he would address the issues when his client returned from a trip out of the country, there was no substantive response until August 25, 2005. At that time, defendants' counsel responded that some of the requested accommodations were the responsibility of the bank and that the "suicide ramp" was not intended to be a means of handicap access that would be used by persons with disabilities even though it was adjacent to a handicap accessible parking space. However, defendants offered to improve the signage, "patch" the area with a broken-up curb ramp, and add one more handicap accessible parking space.

A few days later, Kopelson responded by letter, requesting that architectural or engineering drawings showing defendants' plan to remediate the violations be forwarded within thirty days and asking that a copy of a contract with a vendor hired to perform the remediation be sent within forty-five days thereafter. He again warned of the plan to file a lawsuit to compel compliance if needed. Additional correspondence sent by defendants' counsel advised that the Shopping Plaza was being reviewed by various township officials and that unspecified changes had been made to the property such that it "comports with all applicable regulations."

Humphries is a member of DAWN, but she did not contact DAWN regarding the accessibility of the parking facilities at the Shopping Plaza and was not aware of the contact between DAWN and defendants. She believed that DAWN was more like a social organization than a source of assistance for redress of her accessibility concerns.

Humphries independently reached out to Kopelson, because he was an attorney she had known for years. She did so in her effort to get the Shopping Plaza to comply with the applicable codes for accessibility, not knowing about his correspondence with defendants on behalf of DAWN. Because the conditions that had been the focus of the complaints remained unchanged and because Humphries herself had experienced those very barriers to access-

ing the premises, Humphries filed a complaint, alleging that the property was not accessible as required by the ADA and the LAD. In her complaint, and in her amended complaint, Humphries identified several accessibility defects as follows:

[a]mong the barriers to accessibility at the Powder Mill Shopping Plaza is an excessively steep ramp; non-compliant and non-existent curb-cuts; handicapped parking that is dangerously located, inadequate in number and dimensions and otherwise non-compliant with the barrier free design codes, which Defendants have refused to remedy despite notice of non-compliance.

Humphries alleged that these defects violated the ADA, 42 U.S.C.A. § 12183(a)(2); regulations implementing the ADA, see 28 C.F.R. 36.402, 36.406, 36 Appendix A; the LAD and the relevant provisions of the LAD's implementing regulations found in the Barrier Free Subcode, N.J.A.C. 5:23–7.10, as well as portions of the Motor Vehicle Code governing handicap accessible parking spaces, see N.J.S.A. 39:4–198.

As part of the litigation, Humphries retained an expert, Edward Hoff, who conducted a site inspection of the complex and prepared a report. Hoff found that there were a total of 156 parking spaces in the three surrounding parking lots that could be used by patrons of the Shopping Plaza. More specifically, there were ninety-four spaces surrounding the shopping center, twenty-six[3] spaces in the lower lot, and thirty-six spaces in the east end lot. Hoff opined that defendant's parking lot did not comply with federal guidelines or state regulations because it had only four handicap accessible spaces where six were required and it had no van-accessible spaces where at least one was required. In addition, Hoff contended that all of the curb ramps that served the Shopping Plaza from the accessible parking spaces were non-compliant because they exceeded permissible height and slope limits.

---

[3] Hoff recognized that there are actually 165 parking spaces at the complex, a total that includes thirty-five spaces in the lower lot. In reaching his opinion, however, he reasoned that nine of those spaces were located in an area he described as the lot's flank. He therefore concluded that only twenty-six of the spaces in the lower lot should be considered to be serving the shopping center.

Prior to trial, the parties entered into a partial stipulation of settlement. Substantively, defendants acknowledged that three of the four curb ramps and all of the parking spaces failed to comply with the applicable accessibility requirements and agreed to specific modifications to the parking area at the Shopping Plaza to comply with the ADA, the LAD, and the regulations adopted pursuant to those federal and state statutes. In addition, defendants agreed to pay Humphries $2,500 in damages. The partial settlement explicitly left two issues unresolved, which the parties submitted to the trial court and which they defined as follows:

pursuant to the ADA and NJ Law whether the appropriate number of handicap [accessible] parking spaces at Powder Mill Shopping Plaza is four or six; and attorney's fees and costs pursuant to the ADA and the LAD pertaining to the subject matter of this Stipulation.

At a hearing convened for the purpose of addressing the reserved issues, the trial court determined that the ninety-four parking spaces directly in front of the Shopping Plaza were insufficient to service it but declined to conclude, for purposes of determining the required number of handicap accessible parking spaces, that the Shopping Plaza was actually serviced by all of the 156 spaces in the surrounding lots. Instead, the court reasoned that at least 101 spaces were regularly used by its patrons, the effect of which was that the four existing handicap accessible parking spaces were inadequate. The court therefore ordered defendants to install and maintain a fifth handicap accessible parking space in the lot nearest to the Shopping Plaza.

The trial court convened a further hearing on July 10, 2009, for the purpose of addressing plaintiff's request for an award of counsel fees. Although defendants vigorously debated when the various alleged inadequacies were addressed, the trial court concluded that the vast majority of the improvements made by defendants were the result of the lawsuit Humphries filed, rather than because of the earlier complaints from DAWN or any voluntary efforts made by defendants. The court found that in 2008, and directly as a result of the lawsuit, defendants made changes consisting of the modification of the height and slope of the curb

cuts, the addition of the fifth handicap accessible parking space in the ninety-four space parking lot as ordered by the court and the addition of signs to correct previously inadequate signage.

Turning to a consideration of an appropriate award of counsel fees for Humphries' attorney, the trial court reviewed counsel's certification of services to establish the lodestar in accordance with the factors outlined in *Rendine*. After a thorough analysis of each time entry,[4] the trial court found that there were no duplicative entries, and that none of the tasks undertaken was excessive, redundant or otherwise unnecessary. On the contrary, the court commented that the hours expended were adequately documented, that counsel's certification demonstrated "productivity" in the use of his time. The court therefore determined that the time expended by counsel was reasonable. Turning to the requested hourly rate, the trial court commented that counsel's $350 hourly rate was "kind of low for this sort of case" as compared to others and that it was therefore appropriate.

Considering the overall lodestar fee in accordance with the *Rendine* factors, the court commented that it was a difficult case and that counsel's facility with the legal issues was appropriately a factor in fixing his hourly rate, and that although the results obtained in terms of money paid to plaintiff were modest, the litigation was the type of matter advancing the public good that would not be brought without the promise of an attorneys' fee award.

The trial court then turned to a consideration of counsel's request for a contingency enhancement of fifty percent. After observing that had plaintiff not prevailed, she would not have been able to pay her attorney anything at all, the court nonetheless decided that the fifty-percent contingency enhancement requested by counsel was too high. That conclusion was based on two

---

[4] It appears from the record that counsel for defendants raised no objections to either the hours that Humphries' attorney included in his certification of services or to the hourly rate that he requested be paid.

considerations. First, the court took into consideration what it characterized as the "limited nature of the suit." Second, the court expressed its belief that the lodestar resulted in a substantial fee, and, although conceding that the court "[did] not know how you could have put in less time and achieved that result," took that into account as well. Supported by those reasons alone, the court "was not inclined to do a fifty percent enhancement. I think that a twenty percent enhancement would be adequate, and it comes out to a very large fee." Based on these findings, the court entered an order awarding fees and costs to Humphries' counsel.

Defendants appealed, raising four arguments directed to the court's award of counsel fees and the mechanism the court used to make its calculation. In an unpublished opinion, the Appellate Division rejected all of defendants' arguments for reasons not germane to this appeal. Plaintiff cross-appealed, arguing that the trial court's evaluation of the contingency enhancement was flawed because the court failed to give any reasons for rejecting the requested fifty percent enhancement and for selecting instead the rate of twenty percent and because the court had failed to address the risk component of the undertaking.

Rather than address those arguments directly, the appellate panel commented that, subsequent to the trial judge's decision in the Humphries matter, another Appellate Division panel had released its decision in *Walker, supra,* 415 *N.J.Super.* at 609, 2 *A.*3d 1165. Observing that the *Walker* court had adopted the "six important rules" outlined in *Perdue, supra,* —— *U.S.* at ——, 130 *S.Ct.* at 1672, 176 *L.Ed.*2d at 505, the Appellate Division concluded that only proof of "rare and exceptional circumstances" can justify a contingency enhancement. The panel then noted that Humphries had not made such a demonstration and that, having searched the record in light of *Perdue's* stringent standards, there was no support for a contingency enhancement to be awarded. The Appellate Division therefore reversed the fee enhancement, and remanded the matter to the trial court to adjust the counsel fee award accordingly.

On remand, the fee award was recalculated in accordance with the Appellate Division's directive and an award of counsel fees for Humphries in the amount $66,031.81 was entered. That judgment reflected the lodestar amount of $63,350, which was calculated by using 181 hours and $350 per hour, to which costs in the amount of $2,681.81 were added. We granted plaintiff's petition to consider the standard to be applied to her request for attorneys' fees, 205 *N.J.* 520, 16 *A.*3d 385 (2011), and we permitted the National Employment Lawyers Association of New Jersey to participate as an amicus curiae.

We need not reiterate our reasons for rejecting the rubric utilized by the United States Supreme Court, most recently articulated in *Perdue,* in favor of our continued adherence to the *Rendine* framework and guidelines. Indeed, we accept the well-reasoned analysis of the trial court that the lodestar fee itself was reasonable, *see Rendine, supra,* 141 *N.J.* at 344, 661 *A.*2d 1202, with the result that the only issue presented to this Court is the request by Humphries' attorney for a contingency enhancement of fifty percent.

The record before this Court offers us the opportunity to illustrate the proper application of the *Rendine* guidelines for contingency enhancements and, in doing so, to fix where on the spectrum of typical and ordinary contingency enhancements this litigation properly is found. Simply put, our references in *Rendine* that contingency awards at the high end of the range are appropriate for cases in which there is no mechanism for the mitigation of the risk of non-payment, no possibility of payment absent an award of fees, and in which the relief sought is primarily not monetary but equitable in nature, *see Rendine, supra,* 141 *N.J.* at 343, 661 *A.*2d 1202, all point in favor of the conclusion that the fifty percent contingency enhancement in this matter was both reasonable and appropriate.

Applying those considerations to the LAD and Barrier–Free Subcode claims that were at the heart of the litigation that Humphries pursued and on which she prevailed, the analysis of

the *Rendine* factors is plain. Her litigation sought relief that was almost entirely equitable in nature. Humphries did not seek monetary compensation, but fought for changes in the accessibility of the premises to bring it into compliance with the strong protections of our civil rights laws. Her litigation served not her sole interests, but the interests of any and all who had been or who might otherwise in the future have been denied access to the premises. The relief she sought, both because it was equitable in nature and because it was designed to serve a broad social purpose, weighs in favor of a contingency enhancement at the highest end of the spectrum authorized in *Rendine*. *See ibid.*

In light of the nature of the relief sought, her attorney could not hope, when he undertook to represent her, that he would be compensated through a large contingent fee award. Nor could he expect that Humphries would be able to pay his fees when she prevailed. Moreover, the claim was met with a vigorous and wide-ranging defense. *See id.* at 344, 661 *A.*2d 1202. Nothing in those circumstances afforded counsel the opportunity to mitigate the risk of non-payment. *Ibid.* (noting that entering into fee agreement that was only partially contingent could mitigate risk). These factors also weigh in favor of a substantial contingency enhancement. *Id.* at 344–45, 661 *A.*2d 1202. Seen in that light, and compared to *Rendine's* usual and ordinary range for a contingency enhancement, the requested fifty percent was eminently reasonable and we perceive no purpose to be served by requiring the Chancery Division to conduct a further analysis of the quantum.

We therefore remand this matter to the trial court for entry of a judgment in Humphries' favor in the amount of $97,706.81. We have derived that sum by accepting the previously-calculated lodestar of $63,350 and applying the fifty percent contingency enhancement, which resulted in an award of counsel fees in the amount of $95,025, and by adding costs in the amount $2,681.81 as found by the trial court.

### III.

We reverse the judgment of the Appellate Division in *Walker v. Giuffre*, A–72–10, only to the extent that it directed that the trial court apply the reasoning of the United States Supreme Court in *Perdue* to the evaluation of the request for a contingency enhancement as a part of the proceedings on remand.

We reverse the judgment of the Appellate Division in *Humphries v. Powder Mill Shopping Plaza*, A–100–10, to the extent that it precluded an award of a contingency enhancement and we remand for entry of judgment in favor of plaintiff in the amount of $97,706 representing counsel fees and costs.

*For affirmance in part/reversal in part/remandment*—Chief Justice RABNER and Justices LONG, LaVECCHIA, ALBIN and HOENS—5.

*Not Participating*—Justice PATTERSON and Judge WEFING (temporarily assigned)—2.