**NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-2274-17T4

CHARLES KAZABA, JR.,
an individual,

      Plaintiff-Respondent/
      Cross-Appellant,

v.

RANDOLPH TOWNSHIP
BOARD OF EDUCATION,
a Corporation,

      Defendant-Appellant/
      Cross-Respondent.

_____

Submitted January 6, 2020 – Decided September 15, 2020

Before Judges Ostrer and Vernoia.

On appeal from the Superior Court of New Jersey, Law Division, Morris County, Docket No. L-1652-12.

Gold Albanese Barletti & Locascio, LLC, attorneys for appellant/cross-respondent (Robert Francis Gold, of counsel and on the briefs; James N. Barletti, on the briefs).

Timothy J. McIlwain, attorney for respondent/cross-appellant.

PER CURIAM

In this employment discrimination and retaliation case, a jury determined defendant Randolph Township Board of Education violated the New Jersey Law Against Discrimination (LAD), N.J.S.A. 10:5-1 to -49, by retaliating against plaintiff Charles Kazaba, Jr., for his filing of a 2012 complaint alleging defendant discriminated against him based on his age.[1] The jury awarded plaintiff $150,000 in damages for his claimed emotional distress, and the court awarded plaintiff's counsel $54,131.75 in attorney's fees, $1,893.44 for costs, and prejudgment interest.

Defendant appeals from the final judgment and the court's orders denying defendant's motions for summary judgment on plaintiff's claim under the Conscientious Employee Protection Act (CEPA), N.J.S.A. 34:19-1 to -14; and for an involuntary dismissal under Rule 4:37-2(b), a directed verdict under Rule 4:40-1, and judgment notwithstanding the verdict and a new trial pursuant to Rule 4:40-2. Defendant also appeals from the court's orders denying its motion for remittitur and awarding plaintiff counsel fees and costs. Plaintiff cross-

---

[1] Plaintiff amended the June 2012 complaint in September 2012. The amended complaint did not include any new causes of action allegations.

A-2274-17T4

appeals from the court's orders dismissing his punitive damages claim and from the court's attorney fee award. Based on our review of the record in light of the applicable legal principles, we affirm.

I.

On June 28, 2012, plaintiff filed a complaint alleging that in 1991 he commenced his employment with defendant as a security guard "performing security and various other general maintenance functions for the security and safety of [a] school." The complaint further averred plaintiff was sixty years of age and that during the five years prior to the filing of his complaint, he was subjected to various employment related actions—including modifying his salary classification, reducing his position from twelve months to ten months per year, eliminating his overtime pay assignments, and failing to promote him—due to his age. He alleged defendant's actions constituted unlawful discrimination and retaliation and created a hostile work environment due to his age, in violation of the LAD.

The complaint also included claims defendant violated the New Jersey Wage and Hour Law (WHL), N.J.S.A. 34:11-56a to -56a38, by failing to pay plaintiff for compensation earned; breaching the collective negotiations agreement between the Randolph Education Association and plaintiff; and

breaching the implied covenant of good faith and fair dealing. Defendant filed an answer to the complaint generally denying plaintiff's allegations.

In an amended complaint filed with leave of court in November 2013, plaintiff repeated his claim defendant violated the LAD and WHL and added a claim alleging a CEPA violation. The CEPA claim asserted defendant failed to pay plaintiff overtime for his appearance at a job-related municipal court matter and denied plaintiff payment for his attendance at an August 2013 training class in retaliation for his filing of the June 2012 lawsuit and for his report to the police that students sped and drove recklessly on school property. The amended complaint did not include the claims asserted in the initial complaint for breach of contract and the implied covenant of good faith and fair dealing. Defendant filed an answer to the amended complaint, again generally denying the allegations and asserting numerous affirmative defenses.

Defendant's Summary Judgment Motion

Defendant subsequently moved for partial summary judgment on plaintiff's CEPA claim, arguing it was not filed within CEPA's one-year limitations period. See N.J.S.A. 34:19-5. The court denied the motion, finding that although the claim was not added to the complaint until more than one year after plaintiff alleged defendant violated CEPA, the claim was timely filed

because it related back to the June 2012 filing of the initial complaint. The court entered an order denying the BOE's motion, and the matter proceeded to trial on plaintiff's age discrimination and retaliation claims.[2]

The Trial Evidence

Following the presentation of evidence at trial, the jury found plaintiff failed to prove defendant violated the LAD either by discriminating against him based on his age or creating a hostile work environment because of his age.[3] The jury, however, found defendant violated the LAD by retaliating against him for filing his June 2012 complaint alleging a violation of the LAD. In our summary of the trial proceedings, we therefore focus on the evidence pertinent to plaintiff's retaliation claim.[4] Plaintiff presented four witnesses: himself; his wife Nancy Kazaba; former BOE member and current BOE employee Henry Ruiz; and his treating physician, Dr. Kenneth Miller.

---

[2] Plaintiff did not prosecute his CEPA or WHL claims at trial. We therefore do not address those claims.

[3] The jury found defendant subjected plaintiff to a hostile work environment, but the jury determined the hostile environment was not based on plaintiff's age. The jury was not asked to determine if plaintiff was subjected to the hostile environment in retaliation for his filing of the June 2012 complaint.

[4] Plaintiff does not cross-appeal from the jury's determination he failed to prove age discrimination and that he was subject to a hostile work environment due to his age. We therefore do not address those claims.

5

Plaintiff testified that during his first seventeen years of employment—from 1991 to 2008—he was the sole security officer at Randolph High School, and he was employed as a twelve-month-per-year employee. He worked closely with the school's dean of students enforcing the rules of conduct, addressing issues related to student possession of controlled dangerous substances, and enforcing speeding and traffic rules in the school's parking lot and access roads; and plaintiff was primarily responsible addressing matters concerning the high school's senior class.

In 2007, defendant hired two former law enforcement officers to also provide security at the high school. Over the ensuing years, defendant hired two additional former law enforcement officers to provide security at the high school. The former law enforcement officers employed by defendant to provide security are referred to as "Ram guards." They are named after the high school's ram mascot. Plaintiff's job title is security officer. The salaries of the Ram guards were, and through trial continued to be, substantially lower than that of plaintiff's.

Plaintiff's employment is subject to annual review and reappointment by defendant, and he has signed separate employment contracts for each year of his employment. During the first seventeen years of his employment, defendant

employed plaintiff for twelve months per year. In 2008, defendant changed plaintiff's appointment to a ten-month period with a concomitant salary reduction. In each successive year thereafter, plaintiff accepted defendant's ten-month appointment—from September through June each school year—and worked only during those months for defendant.

In 2008, plaintiff's long-time office in the high school was moved to what he described as a former storage closet.

2011

On March 7, 2011, a "very nervous and disheveled" student asked plaintiff if he had a gun and if plaintiff had guns at home. According to plaintiff, the student "seemed very interested [if there was] a SWAT team directly across the street at the police department." That evening, a Randolph police officer called plaintiff to talk about traffic issues at the high school, and plaintiff described the student's statements to the officer.

As a result of the conversation, plaintiff prepared an incident report about his conversation with the student. On his way to the school the following day, and before he turned in his incident report, plaintiff again spoke to the police officer. When he arrived at school, he turned in his incident report.

Plaintiff later received a March 16, 2011 letter from the high school principal, Debbie Iosso, stating plaintiff shared information concerning the incident with a police officer before providing the information to the school administration. The letter stated plaintiff waited until 8:15 a.m. on the day following the incident to report it to the school administration, plaintiff's delay in reporting the incident was "unacceptable," and plaintiff shared information concerning the student that "should have been protected with confidentiality." Plaintiff acknowledged the letter informed him of defendant's policy and did not chastise or discipline him in any way. Plaintiff testified the letter made him very uncomfortable, and that he was told it would go in his personnel file.

In September 2011, then superintendent of schools David Browne publicly congratulated plaintiff for twenty years of service during a meeting of the school district staff on the first day of school. Plaintiff testified that during his years of employment prior to September 2011, he was scheduled to work between 6:45 a.m. and 2:30 p.m., and he also worked an additional hour-and-one-half of overtime every workday. Thus, his normal work hours were from 6:45 a.m. to 4:15 p.m.

In September 2011, Browne informed plaintiff that plaintiff earned too much overtime pay as a percentage of his overall compensation, and that he

would no longer work any overtime. Iosso then modified plaintiff's schedule and eliminated his daily overtime.

On June 28, 2012, plaintiff filed his complaint alleging defendant violated the LAD and WHL and breached a contract and the covenant of good faith and fair dealing. In part, the allegations were founded on the 2008 change in plaintiff's employment from twelve months to ten months per year and Browne's and Iosso's elimination of plaintiff's daily overtime in 2011. Plaintiff testified defendant "was notified of [the] suit" on the same day it was filed.[5] Based on plaintiff's ten-month schedule, he did not work for defendant during July and August.

According to plaintiff, within a few days of his return to school following the summer break, and less than three months after he filed his complaint, on September 6, 2012, he met with Iosso. On three occasions during the meeting, she informed plaintiff that she used performance evaluations to determine who would be retained and who would be let go at the end of the school year. Plaintiff found the statements, made immediately upon his return to school after the filing of his complaint, threatening and demoralizing. Later in the day, he

_____

[5] Plaintiff initially testified on direct examination that his complaint was filed on May 28, 2012, but he later corrected his testimony, noting he "spoke[] in error" and his complaint was filed on June 28, 2012.

approached Iosso and explained how he felt, and Iosso asked if plaintiff was questioning her management skills and if he thought he could perform his job duties.

Iosso sent plaintiff a September 10, 2012 letter describing their meeting and detailing her expectations for the performance of his job duties during the school year. The letter provided a schedule of times and places Iosso expected plaintiff to patrol each day and, according to plaintiff, essentially required the performance of all his job duties outside of the high school building. The letter included an offer to keep one of the ticket booths used for football games "outside for [plaintiff] in case there were times the weather was inclement and [he] needed some shelter." Plaintiff described the ticket booth as a "two by four wooden structure with . . . perhaps a little . . . siding," but with no electricity or light.

Also in September 2012, Iosso advised plaintiff he would no longer be responsible for changing the message board marquee that was outside the high school. For many years, plaintiff had the responsibility of creating and placing the messages posted on the marquee, and he took great pride in performing that task. Plaintiff acknowledged in part the elimination of that responsibility was to allow special education students to post the messages on the marquee. He

also testified Iosso informed him that elimination of his responsibility for the marquee was to afford him more time to perform security functions.

Plaintiff testified that in October 2012, Iosso rejected his request for compensation for his appearance at August 2012 municipal court proceedings involving a traffic summons issued to a student for alleged careless operation of a vehicle on school grounds. In May 2012, plaintiff observed a student driving a vehicle with its tires screeching near other students at the school, and plaintiff worked with the police in the issuance of a careless driving ticket to the student.

Following the filing of his complaint in June 2012, plaintiff was subpoenaed on two occasions in August 2012 to testify in municipal court in connection with the matter. In response to the subpoenas, he appeared in court for a total of eight-and-one-half hours and submitted a request for compensation to Iosso when he returned to the school in September. According to plaintiff, Iosso responded with a note stating, "See me." Plaintiff then emailed Iosso requesting an opportunity to discuss his request for compensation, but Iosso never responded and plaintiff was never paid. Plaintiff testified he had always been paid in the past for time spent as a witness in court for offenses committed on school property.

Plaintiff further testified that in the Fall of 2012, he met a police officer who arrived outside the high school in response to a 9-1-1 call. Plaintiff brought the officer into the building and presented him to Iosso. After introducing the officer to Iosso, plaintiff "immediately felt unwelcome" because Iosso did not answer him and spoke only to the officer. Plaintiff left the building and returned to the car he used to patrol the school grounds.

In April 2013, plaintiff received a RICE notice from Browne.[6] It was the first RICE notice he had ever received during his twenty-two years of employment with defendant. The notice advised plaintiff that issues concerning his employment would be discussed by defendant at an upcoming meeting, and the notice offered plaintiff the option of having the discussion in either a private or public meeting. Plaintiff opted to have any personnel issues related to him discussed in a public meeting. Plaintiff's wife attended the scheduled meeting, but there was no discussion concerning plaintiff.

Plaintiff explained that prior to the filing of his complaint, he had always been permitted to use his school patrol vehicle as transportation to and from his

---

[6] The term "RICE notice" refers to the notice a board of education must provide to an employee advising of the board's intention to consider personnel matters related to the employee at a public meeting. See Rice v. Union Cty. Reg'l High Sch. Bd. of Educ., 155 N.J. Super. 64, 74 (App. Div. 1977).

home because he was an "on-call" employee who was expected to return to the school if there was a security issue that required his attention. On May 3, 2013, however, Browne informed plaintiff his use of the vehicle to commute between the school and his home was "illegal." Iosso was present when Browne conveyed that information to plaintiff. Although plaintiff had used the vehicle to travel to work that day, Browne instructed plaintiff to immediately discontinue his use of the vehicle. Plaintiff was not permitted to use the vehicle to return home. He opted to walk eight miles to his home after work that day. Plaintiff acknowledged the prohibition against using a school patrol vehicle to commute to and from home applied to all employees.

On May 20, 2013, plaintiff received a corrective action plan from a vice principal at the high school who, at the time, served as plaintiff's direct supervisor. The plan referred to alleged performance deficiencies and stated "incidents have been reported throughout the day via walkie-talkie, phone or email, interrupting the administration's daily tasks," plaintiff spent too much time in the office reporting student infractions and recording parking changes, and plaintiff was not adequately maintaining security of the school's outside doors. The corrective action plan included a recommendation plaintiff use electronic means of communication, such as email. Prior to his receipt of the

corrective action plan, plaintiff had never been criticized or counseled about the manner in which he communicated throughout the workday.

Plaintiff called Harry Ruiz as a witness at trial. Ruiz explained he became a Board of Education member of thein 2011 or 2012 and resigned after about a "year or so" in March 2013. Plaintiff testified Ruiz was on the Board of Education from 2011 until his resignation in March 2013. Thus, Ruiz was a member of defendant when plaintiff's complaint was filed and, according to plaintiff, provided to defendant on June 28, 2012.

In May 2013, two months after Ruiz's resignation, defendant created a new position: director of security. Ruiz was hired to fill the position and started in September 2013. In that capacity, Ruiz thereafter served as plaintiff's direct supervisor, and he also supervised the Ram guards.

Plaintiff explained that at back-to-school night at the start of the 2013 school year, there was a presentation shown in every classroom to visiting parents that listed the school's security employees. The list included Ruiz's name and the names of the Ram guards, but it did not include plaintiff's name.[7]

---

[7] Plaintiff provided conflicting testimony concerning the date of the back-to-school night at which his name was not included in the list of security employees. He testified the list was presented at the 2014 back-to-school night and also said he "believe[d]" it was at the 2013 back-to-school night, but he was not certain.

14

He testified the exclusion of his name from the roster of security guards caused him embarrassment and humiliation.

According to plaintiff, shortly after Ruiz started as director of security in September 2013, plaintiff noticed Ruiz following him home in Ruiz's personal vehicle. Once home, plaintiff stood outside his vehicle with his wife and saw Ruiz drive slowly down the street in front of plaintiff's home, brake, and then speed away. Plaintiff testified his wife felt threatened by Ruiz's actions. Ruiz denied the incident.

In February 2014, plaintiff received a second RICE notice from Browne, again advising that personnel issues concerning plaintiff were to be discussed at defendant's upcoming meeting and providing plaintiff with the option of having the discussions take place in a public or private session. Plaintiff opted for a discussion in a public session and attended the March 19, 2014 meeting.

During the meeting, Browne publicly stated plaintiff had been the subject of a corrective action plan and that, since the plan was implemented, plaintiff had numerous "job performance" letters placed in his file. Plaintiff testified Browne's public statement was false because never violated the corrective action plan and no job performance-related letters were placed in his file following the

A-2274-17T4

plan's implementation. Plaintiff was "hurt" and felt "wronged" by Browne's false statement.

Plaintiff testified that on March 5, 2014, Ruiz asked if he was sixty-two, spoke to plaintiff about the benefits of collecting social security at that age, and suggested plaintiff buy back military time to enhance his pension. Ruiz testified plaintiff solicited the information, but plaintiff denied that he did. On April 11, 2014, Ruiz told plaintiff "to try and cut a deal for early retirement." Plaintiff testified he told Ruiz he was not interested in retiring and that he had a lawyer, and Ruiz told him to "leave your lawyer out of it."

In March 2014, Ruiz informed plaintiff that, effective April 1, 2014, plaintiff was reassigned from the regular day shift he had worked for the previous twenty-three years to a 2:00 p.m. to 10:00 p.m. shift. No one had ever been assigned to work the shift before, and none of the Ram guards were assigned to that shift. During defendant's case, Jennifer Fano testified Ruiz discussed the change of plaintiff's shift with Browne, who then obtained defendant's approval of the change.

Ruiz informed plaintiff about the new shift assignment during a meeting with Michael Neves, the district's business administrator. According to plaintiff, Ruiz said he assigned plaintiff to the shift because plaintiff "was the most

16

valuable person in the school district, [and] the most experienced." Plaintiff said he did not want to work the new shift, but during the meeting he was told he had no choice.

On the same day, Ruiz also assigned plaintiff to monitor for five days the sixth-grade boys' bathroom at the middle school to address a graffiti problem. Plaintiff felt "disrespected" by the boys' bathroom assignment. Ruiz testified during defendant's case the assignment was made at the request of the middle school's principal to address a graffiti problem involving swastikas and possible bullying.

During his direct examination, Ruiz explained he implemented the new 2:00 p.m. to 10:00 p.m. shift to provide security at the high school, middle school, and elementary schools in the district during the many school activities occurring in the afternoon and evening hours during the school year. Ruiz explained plaintiff was assigned because his employment history provided an "understanding [of] the grounds and everything," and plaintiff was familiar to the students and parents who attended the events held after school and at night.

According to plaintiff, when he was transferred to the 2:00 p.m. to 10:00 p.m. shift, he felt he was placed in a "watchman's position," although he acknowledged that seasonal sports and other events at the schools typically did

17

not end until 8:30 p.m. to 9:00 p.m.   Plaintiff explained that, since his assignment to the 2:00 p.m. to 10:00 p.m. shift, he works exclusively patrolling outside the high school building and the other school and administrative buildings in the district, "[m]aking sure the doors and windows are closed and the gates are locked and, . . . if you see something, report it, but, if not, just put in your time and go home."   Plaintiff explained that, as a result of the shift change, he is no longer required to perform numerous other job duties he had performed since 1991.

Plaintiff described the following job duties he performed prior to his shift change: transport senior citizen volunteers to work at the high school information desk; transport Morris County Vo-Tech school students who miss the bus; transport students to urgent care facilities for substance abuse evaluations; make the school district's banking deposits; serve as a special delivery carrier; transport large bulk mailings to the post office; hand deliver mail related to truancy to Randolph residents; pick up materials from local vendors; place mounts on the school doors; cut keys for supervisors and teachers; maintain a box of lost keys; fix classroom intercoms; patrol school hallways; respond when students disrupted classrooms; organize fire drills; maintain vehicle information on all students, including their assigned parking

18

spaces; maintain a list of all student violations; write tickets for student violations; and operate a radar gun and assist students with their vehicles in the parking lot.

Plaintiff testified that as a result of the actions taken, which altered his work schedule and work assignments, he felt disrespected, he suffered from a loss of his sense of value, and he had a concern and fear he would lose his job. Plaintiff's wife testified that following the filing of his lawsuit in 2012, plaintiff's demeanor and sleep patterns changed, and plaintiff was "very stressed," emotional, and short-tempered.

Immediately after he was informed of the shift change, plaintiff opted to have a surgical procedure because he was "afraid" he would lose his medical benefits and he was "demoralized at work." As a result, plaintiff did not start the new shift in April 2014 as originally assigned. Instead, he had the surgery, was out on medical leave, and, following the summer break in his work schedule, he began the new shift in September 2014 when the school year started.

Plaintiff testified the shift change "[d]rastically" and "[a]bsolutely" affected his relationship with his wife. He explained he wanted to spend time with his wife, but the shift change greatly reduced the time he could spend with her during the workweek. Plaintiff's "children were grown and gone" from his

home, and his "wife worked during the day, . . . she worked long hours," and she returned home at around 5:30 p.m. each workday.

Prior to the shift change, plaintiff arrived home each workday at around 3:00 p.m., cooked dinner, and ate dinner with his wife when she arrived home from work. He and his wife then spent the evenings together. Following the shift change, his wife arrived home from work and ate alone because plaintiff did not arrive home until 10:30 p.m. Thus, the shift change prevented plaintiff and his wife from spending little more than an hour together each workday before they went to sleep.

Moreover, the shift change required that plaintiff work at night in what he described as "very isolate[ed]" circumstances. No other security personnel worked the shift with plaintiff, and the shift was not rotated among the security personnel. He felt the shift change "diminished" his "talents." Indeed, Ruiz testified during defendant's case that when plaintiff was out on medical leave after he commenced working the new shift, other security guards were assigned to fill the shift but only "when necessary." At the time of trial in 2017, plaintiff had been working the new shift for more than two-and-a-half years.

Plaintiff testified that by the Spring of 2013, the filing of his lawsuit was a matter of public knowledge, but he had no personal knowledge of who was

20

aware of the filing of his lawsuit. He also testified, however, that in May 2013, one of the co-presidents of his collective negotiations representative, the Randolph Education Association, said Browne had mentioned the lawsuit to him. Ruiz testified he was aware of plaintiff's lawsuit because plaintiff told him about it "after [Ruiz's] first year there around the holidays." That is, Ruiz testified he was first told about the lawsuit at the end of 2014.[8]

Plaintiff also presented the testimony of Dr. Kenneth Miller, plaintiff's long-time physician.[9] Dr. Miller testified that on a number of occasions plaintiff reported suffering from stress at work, as well as stress from other sources including illnesses of plaintiff's family members. Dr. Miller testified his recommendations for treatment of the reported stress—which included medication and counseling by a psychologist—were not based on a determination or diagnosis that plaintiff's work caused the reported stress.[10]

---

[8] It is undisputed Ruiz became employed by defendant in September 2013. Thus, the holidays "after his first year" would be in November or December 2014.

[9] Dr. Miller was permitted to testify following a N.J.R.E. 104 hearing on the issue of the admissibility of his testimony as to the cause of plaintiff's alleged stress.

[10] Dr. Miller testified plaintiff did not follow his treatment recommendations.

21

After permitting Dr. Miller to testify, the court granted defendant's motion to strike the testimony, finding it was irrelevant because Dr. Miller did not testify as an expert; he had not provided an expert report; and he did not testify that his recommendations for treatment of the reported stress were based on a determination plaintiff's work was its cause. The court instructed the jury Dr. Miller's testimony was stricken and the testimony could not be considered for any purpose.

Following the presentation of plaintiff's case, the BOE moved for a directed verdict on liability pursuant to Rule 4:37-2(b) on plaintiff's LAD age discrimination and retaliation claims. In a brief opinion from the bench, the court denied the motion, finding plaintiff presented prima facie evidence supporting his claims. In addressing plaintiff's retaliation claim, the court stated only that plaintiff presented evidence showing he engaged in protected activity by filing his June 2012 complaint.

During its case, defendant presented the testimony of Jennifer Fano, who began her employment with defendant in 2009, became the assistant superintendent in 2011, the interim superintendent in 2015, and the superintendent in 2016. Fano explained the 2008 change in plaintiff's employment from twelve months to ten months resulted in substantial financial

savings and was consistent with defendant's policy of fiscal responsibility. She also explained that Browne, who served as superintendent from 2011 to 2015, reviewed all overtime assignments to reduce costs. Fano further testified that the prohibition against employee use of school vehicles was for the purpose of reducing inefficiencies in the use of the vehicles.

Fano explained she did not learn of the filing of plaintiff's lawsuit until she became the interim superintendent in 2015. She also testified, however, that the superintendent will immediately respond to any complaints of discrimination, immediately investigate—or cause to be investigated—such claims, and report to defendant such complaints.

Defendant also called Ruiz as a witness. He explained the actions he took as plaintiff's supervisor after he became the director of security in September 2013. He offered financial and security related reasons for each action that are wholly unrelated to plaintiff's age or the filing of the 2012 complaint.

In rebuttal, plaintiff called his wife, and he also testified. Their testimony reprised their prior testimony concerning defendant's alleged actions.

Defendant moved for a directed verdict. The court reserved decision on defendant's motion.

Following the closing arguments of counsel and the court's instructions on the law, the jury deliberated and returned a no-cause verdict on plaintiff's age discrimination claim and, although the jury found defendant subjected plaintiff to a hostile work environment, the jury found no-cause to conclude the hostile environment was based on plaintiff's age. The jury determined defendant violated the LAD by retaliating against plaintiff for the filing of his 2012 complaint, and it awarded plaintiff $150,000 in emotional distress damages.

Prior to discharging the jury, defendant moved for dismissal of plaintiff's punitive damages claim. The court granted the motion, finding plaintiff failed to present evidence defendant's actions were especially egregious, and that plaintiff did not prove any upper management employee "actually participated in or was willfully indifferent to the wrongful conduct."

Defendant moved for a judgment notwithstanding the verdict and, in the alternative, for a new trial. In a written opinion, the court denied defendant's motions for an involuntary dismissal, for a directed verdict, for a judgment notwithstanding the verdict, and for a new trial. The court considered the motions under the standards applicable to each and found plaintiff presented sufficient evidence at each of the respective stages of the trial to support his

A-2274-17T4

cause of action for retaliation in violation of the LAD. The court also denied defendant's motion for remittitur.

Plaintiff subsequently submitted a fee application in the amount of $602,404. The application was supported by a certification from plaintiff. At the hearing on the application, the court determined plaintiff's counsel submitted a certification with an attached list of "fee and cost detail, including rate, billing professional, a description of services performed, and date of service."

The list was comprised of thirty pages of separate entries describing work allegedly performed and corresponding amounts of time detailed to tenths-of-an-hour from plaintiff's counsel's initial conference with plaintiff in December 2011 through the June 2017 filing of the fee and costs application. The list showed plaintiff's counsel, and other lawyers and paralegals, devoted over 1300 hours to the prosecution of plaintiff's claims. The list also detailed $5,717.02 in expenses plaintiff's counsel claimed he incurred during the matter.

It was later learned plaintiff's counsel had not maintained any contemporaneous time records supporting his request for attorney's fees. Instead, plaintiff's counsel explained he recreated six years of time spent on the matter based on his review of his file, correspondence, and calendar. Defendant claimed plaintiff's counsel's certification falsely suggested the fee request was

25

based on contemporaneous time records, and defendant pointed out the list included an entry for a court appearance that never occurred.

Plaintiff's counsel retained his own counsel and subsequently submitted a supplemental affidavit supporting his request for fees and costs. Plaintiff's counsel's supplemental affidavit included an attached list of time spent on tasks during the case's six-year history. The total hours plaintiff claimed he spent on the matter were reduced to 662.6. He noted that another attorney and two paralegals spent an additional 158.4 hours on the matter. Plaintiff's counsel sought $281,270 in fees and, again, $5,717.02 in costs.

During oral argument on the motion, defendant again asserted plaintiff's counsel's initial certification constituted a fraud because it failed to disclose it was not based on contemporaneously maintained time records, and it included representations of time spent on a court event that did not occur. Defendant argued plaintiff's counsel's supplemental affidavit was similarly not based on contemporaneous records, and plaintiff's counsel did not demonstrate exigent circumstances permitting his reliance on reconstructed time records. Plaintiff's counsel's attorney asserted that plaintiff's counsel prevailed at trial; plaintiff's counsel had clearly performed services before, during, and after trial on

plaintiff's behalf; and the revised records were sufficiently reliable to support a fee award.

In a detailed written opinion, the court found plaintiff's counsel's original certification was "totally unreliable and untrustworthy." The court also found the revised figures in the supplemental affidavit were "similarly unreliable" and it "appear[ed they] . . . were created just to arrive at a more reasonable bottom line and do not reflect the actual time devoted to any tasks in the case."

The court found plaintiff's counsel failed to show "his time devoted to this matter was reasonable," but the court determined it should create "its own calculation of what was reasonable time spent given what plaintiff's counsel did or did not do in litigating this matter." The court reviewed the list of claimed services provided and determined "what the reasonable time would be for 'competent counsel' to perform such services." The court identified ten areas of services it determined plaintiff's counsel provided during the course of the matter, assigned what the court determined were reasonable times that should have been devoted to each, and determined a reasonably competent attorney would have spent 201 hours on the matter.

The court also assessed plaintiff's counsel's experience and his performance at trial, and it awarded a rate of $350 per hour for a lodestar of

$70,350. The court reduced the lodestar by thirty percent because plaintiff did not succeed on his age discrimination and hostile environment claims, and plaintiff's counsel failed to earnestly engage in settlement discussions. The court also enhanced the lodestar by fifteen percent because plaintiff's counsel took the case on a contingency fee basis and served the public interest by vindicating plaintiff's civil rights. The court therefore awarded plaintiff's counsel $56,631.75 in counsel fees, which was reduced by $2,500 for a fee previously paid to counsel.

The court also reviewed each of plaintiff's counsel's claimed expenses and disallowed many of them because they were unsupported by any evidence or were unreasonable. The court awarded plaintiff's counsel $1,893.44 of the $5,717.02 in costs sought.

The court entered a final judgment dismissing the age and hostile work environment claims, granting plaintiff judgment for $150,000 on his LAD retaliation claim, and awarding $56,025.19 in attorney's fees and costs. Defendant appealed, and plaintiff cross-appealed.

II.

Defendant and plaintiff present numerous arguments in support of their respective appeals. We consider the arguments presented in turn.

A-2274-17T4

A.

Defendant first argues the court erred by denying its motion for summary judgment on plaintiff's CEPA claim because plaintiff could not sustain his burden of establishing: he provided defendant with written notice of its alleged unlawful practice of failing to pay plaintiff for his attendance at municipal court proceedings on defendant's behalf; he engaged in protected activity under CEPA; he had an objectively reasonable belief defendant engaged in an unlawful activity; he was subject to an adverse employment action; and there was a causal connection between the alleged protected activity and the retaliatory action. See generally Dzwonar v. McDevitt, 177 N.J. 451, 462 (2003) (defining the elements of a CEPA claim).

We reject defendant's arguments for two reasons. First, plaintiff did not prosecute his CEPA claim at trial, and the jury was not required to decide the claim. As such, issues pertaining to the court's disposition of the motion for summary judgment on the CEPA claim are moot. Any decision we might render on the merits of the court's denial of the summary judgment motion "can have no practical effect on the existing controversy," Redd v. Bowman, 223 N.J. 87, 104 (2015) (citations omitted), and we generally will not decide an issue that "is hypothetical" or where "a judgment cannot grant effective relief, or the parties

do not have concrete adversity of interest," Cinque v. N.J. Dep't of Corr., 261 N.J. Super. 242, 243 (App. Div. 1993) (citations omitted). Plaintiff abandoned the CEPA claim at trial. Consideration of defendant's argument it was entitled to summary judgment is therefore unnecessary.[11]

In addition, the summary judgment record on appeal does not support defendant's argument. We review a court's decision on a summary judgment motion de novo applying the same standard as the trial court. Henry v. N.J. Dep't of Human Servs., 204 N.J. 320, 330 (2010). The summary judgment record presented on appeal includes only a statement of material facts, see R. 4:46-2, submitted in support of defendant's motion. The statement is limited to facts supporting defendant's assertion it was entitled to summary judgment because the CEPA claim was filed beyond the one-year limitations period in N.J.S.A. 34:19-5.

The court denied defendant's motion for summary judgment, finding the CEPA claim was timely filed. Defendant does not challenge that determination on appeal and instead argues the court erred because plaintiff could not sustain his burden of proving the substantive elements of his CEPA claim. The record

---

[11] In plaintiff's brief on appeal, he acknowledges he waived the CEPA claim by not prosecuting it at trial.

on appeal does not show that argument was made to the motion court, <u>see</u> <u>Nieder v. Royal Indem. Ins. Co.</u>, 62 N.J. 229, 234 (1973) (explaining generally there is no appellate review of an argument that was not presented to the trial court), and the summary judgment record included in the record on appeal does not support a de novo finding defendant was entitled to summary judgment on the merits of the CEPA claim. Thus, even if the court's order denying defendant summary judgment on the CEPA claim was not moot, we would reject defendant's appeal from the order denying its summary judgment motion.

B.

Defendant next argues the court erred by denying its <u>Rule</u> 4:37-2(b) motion for an involuntary dismissal at the end of plaintiff's case and its motion for judgment pursuant to <u>Rule</u> 4:40-1 at the close of the evidence. Defendant argues its motions should have been granted as to plaintiff's LAD age discrimination claim, hostile work environment claim, and LAD retaliation claim. We address defendant's argument only as to the LAD retaliation claim because the jury found plaintiff failed to prove his age discrimination related claims.

We review motions under <u>Rule</u> 4:37-2(b) and <u>Rule</u> 4:40-1, applying the same standard as the trial court. <u>Smith v. Millville Rescue Squad</u>, 225 N.J. 373,

31

397 (2016). In both motions, we apply "'the same evidential standard: "if, accepting as true all the evidence which supports the position of the party defending against the motion and according him [or her] the benefit of all inferences which can reasonably and legitimately be deduced therefrom, reasonable minds could differ, the motion must be denied."'" Ibid. (quoting Verdicchio v. Ricca, 179 N.J. 1, 30 (2004)). A motion made under either Rule "should only 'be granted where no rational juror could conclude that the plaintiff marshaled sufficient evidence to satisfy each prima facie element of a cause of action.'" Ibid. (quoting Godfrey v. Princeton Theological Seminary, 196 N.J. 178, 197 (2008)).

The LAD provides that it is "unlawful discrimination . . . [f]or any person to take reprisals against any person because that person has . . . filed a complaint . . . under this act." N.J.S.A. 10:5-12(d). To sustain his burden of proving an LAD retaliation claim pursuant to N.J.S.A. 10:5-12(d), plaintiff was required to prove he "'engaged in a protected activity known to the [BOE,]' [he] was 'subjected to an adverse employment decision[,]' and there is a causal link between the protected activity and the adverse employment action." Battaglia v. United Parcel Serv., Inc., 214 N.J. 518, 547 (2013) (quoting Woods-Pirozzi v. Nabisco Foods, 290 N.J. Super. 252, 274 (App. Div. 1996)). Plaintiff was

also required to establish he had a good faith basis for engaging in the protected activity. Carmona v. Resorts Int'l Hotel, Inc., 189 N.J. 354, 371 (2007).

Defendant does not dispute plaintiff presented evidence he engaged in protected activity—the filing his 2012 complaint—and he suffered from adverse employment actions following his protected activity. Defendant contends the court erred in denying its motions because plaintiff failed to present evidence that: he filed the 2012 complaint in good faith; Browne, Iosso, and Ruiz—the individuals who took the alleged retaliatory actions—knew about the filing of the complaint; and there was a causal link between the filing of the complaint and the adverse employment decisions.

In our assessment of defendant's motions, we are "not concerned with the worth, nature[,] or extent (beyond a scintilla) of the evidence, but only with its existence, viewed most favorably to the party opposing the motion." Dolson v. Anastasia, 55 N.J. 2, 5-6 (1969). The jury was not persuaded that defendant discriminated against plaintiff because of his age, but there was a least a scintilla of evidence supporting a determination plaintiff had a good basis to file a claim he was the victim of age discrimination.

For example, plaintiff testified he was the oldest employee classified as support staff under the collective negotiations agreement, and he was the only

employee within the classification whose work schedule was reduced from twelve months to ten months. Plaintiff also presented evidence concerning the school district's consistently increasing annual budgets that supports a conclusion at least one of the proffered reasons for the change in his work schedule—cuts in State aid to the school budget—was not the true reason for the change. To be sure, and as the jury ultimately concluded, plaintiff's age discrimination claims rested on weak evidence, but there was at least a scintilla of evidence supporting a finding plaintiff had a good faith and reasonable belief for alleging age discrimination in the 2012 complaint. See Carmona, 189 N.J. at 373; see also Kluczyk v. Tropicana Prods., Inc., 368 N.J. Super. 479, 493 (App. Div. 2004) (holding that "a retaliatory discharge in violation of the LAD can occur even if there was no underlying unlawful harassment").

Defendant agues the court erred by failing to dismiss the retaliation claim because there was no evidence defendant knew of the filing of the plaintiff's complaint. The argument ignores the evidentiary record. During plaintiff's case, Ruiz admitted he learned about plaintiff's lawsuit in late 2014, and plaintiff testified that in May 2014 he was informed by his collective negotiations unit co-president that Browne had mentioned plaintiff's lawsuit.

Giving, as we must, plaintiff the benefit of all reasonable inferences, see Smith, 225 N.J. at 397, we are also convinced there was additional evidence presented during plaintiff's case permitting the conclusion Browne, Ruiz, and Iosso became aware of the lawsuit at the time it was filed. Plaintiff testified every employee in the school district reported to Browne because he was the district's superintendent. That evidence—and other evidence showing Browne made the decision to eliminate plaintiff's overtime, communicated that decision and other decisions affecting plaintiff's employment to plaintiff, issued RICE letters addressing what would occur at the Randolph Board of Education meetings, and publicly addressed plaintiff's employment on defendant's behalf at defendant's meeting—supports the reasonable inference Browne ran the school district on defendant's behalf. In addition, and as detailed during trial, one of the claims asserted in plaintiff's 2012 lawsuit was that Browne and Iosso discriminated against plaintiff by changing plaintiff's work schedule and eliminating his overtime based on his age.[12]

---

[12] Plaintiff's June 28, 2012 complaint expressly alleged the September 2011 elimination of his overtime assignment was at Iosso's direction. In addition, although the complaint did not mention Browne by name, it alleged the September 2011 elimination of his overtime assignment, which the evidence showed Browne and Iosso implemented, violated the LAD.

Given those circumstances, a reasonable inference can be drawn that a complaint alleging defendant violated the LAD by discriminating and retaliating against a long-term employee like plaintiff, and alleging Browne and high school principal Iosso committed alleged discriminatory acts, was brought to Browne's attention immediately upon the complaint's filing. It would be illogical to conclude otherwise.

For similar reasons, the evidence presented during plaintiff's case allowed a reasonable inference Iosso would have been made immediately aware of the filing of plaintiff's complaint. The evidence showed Iosso worked directly with Browne on issues related to plaintiff's employment—they met with plaintiff in 2011 and changed his work schedule and eliminated his overtime assignment— and Iosso played a direct role in supervising plaintiff's daily job duties. Iosso was the principal of the high school where plaintiff worked, and she met with plaintiff and explained her expectations for the performance of his duties for the 2012-2013 school year: she precisely defined the locations at the school plaintiff was required to check during the day; and she informed plaintiff he would consider the manner in which he performed his duties in deciding whether to renew his contract for the following year. "A 'reasonable inference' is a deduction which in terms of probability, as distinguished from mere possibility,

A-2274-17T4

is supported by the common experience of mankind." Lambe v. Reardon, 69 N.J. Super. 57, 66 (App. Div. 1961). Based on the evidence, it is probable that Iosso, whose actions the complaint alleged violated the LAD, would have been made immediately aware of a complaint made by an employee over whom she actively and directly exercised such authority and control.

Similarly, plaintiff testified defendant became aware of the complaint the day it was filed, June 28, 2012, and the evidence showed Ruiz was a member of the BOE at that time. He was a member of the named defendant in plaintiff's complaint, and the complaint alleged defendant, of which Ruiz was a member, violated the LAD and WHL. In our view, that evidence alone supports a finding it is probable Ruiz, in his capacity as a board member, was made aware of the complaint at or near the time it was filed. Thus, even though Ruiz acknowledged only knowing about plaintiff's complaint in late 2014, the evidence supports a reasonable inference he knew about it in 2012 when defendant, of which he was then a member, first learned about the complaint.

The evidence presented during plaintiff's case required rejection of defendant's motion for an involuntary dismissal, as well as defendant's subsequent motion for a directed verdict. However, when defendant made its motion for a directed verdict after the presentation of its case, there was

additional evidence permitting the reasonable inference Browne, Iosso, and Ruiz knew about the complaint at the time it was filed.

During defendant's case, Fano explained that when a discrimination complaint is filed, a superintendent of schools will both immediately investigate the complaint (or ask a third party to do so), and immediately report the complaint to the board of education. Her testimony therefore further supports the reasonable inference Browne immediately investigated the discrimination claim in plaintiff's complaint. Such an investigation would have necessarily involved Iosso because the complaint in part alleged she violated the LAD. In addition, Fano's testimony made clear Browne would have immediately reported the complaint to defendant, of which Ruiz was a member when the complaint was filed and for the ensuing nine months.

Moreover, the evidence showed Ruiz sought and obtained Browne's approval for the April 1, 2014 change of plaintiff's shift, and that Browne obtained defendant's approval of the shift-change prior to its implementation. We are convinced it is reasonable to infer that plaintiff's shift change—which was approved by his direct supervisor, the district's superintendent, and the defendant named in plaintiff's complaint—would have been tethered to some mention of plaintiff's complaint and pending litigation.

A-2274-17T4

In sum, we reject defendant's claim the respective records before the court on defendant's motions for an involuntary dismissal and a directed verdict did not include the requisite scintilla of evidence establishing Browne, Iosso, and Ruiz had knowledge of the filing of plaintiff's complaint. We also are not persuaded by defendant's assertion plaintiff failed to present sufficient evidence there was a causal connection between plaintiff's protected activity and the adverse employment actions about which plaintiff complained. See Battaglia, 214 N.J. at 547.

Plaintiff worked for defendant for twenty-one years prior to the filing of his complaint without any evidence of discipline or displeasure about his work performance. The evidence showed that prior to the filing of his complaint, Browne modified plaintiff's schedule and changed his hours, but there is no evidence the actions were taken as the result of dissatisfaction with plaintiff's job performance. That changed immediately following the filing of the complaint.

According to plaintiff, upon his return to work in September 2012, following his two-month break after the filing of the June 28, 2012 complaint, he was confronted by Iosso, an individual his complaint alleged violated the LAD. Plaintiff described the meeting as threatening, and Iosso followed the

39

meeting with a letter detailing plaintiff's duties outside of the school and suggesting plaintiff could seek refuge from the elements in a small wooden ticket booth. Browne acted immediately in September as well; he removed from plaintiff his long-standing and valued assignment of changing the message marquee. Weeks later, Iosso denied plaintiff's request to be paid for time spent in municipal court on a summons he worked with the police to issue to a student. Plaintiff testified he had always been paid for such appearances prior to the filing of his complaint.

The causal connection element of a retaliation claim "can be satisfied by inferences that the trier of fact may reasonably draw based on circumstances surrounding the employment action. The temporal proximity of employee conduct protected by CEPA and an adverse employment action is one circumstance that may support an inference of a causal connection." Maimone v. City of Atl. City, 188 N.J. 221, 237 (2006) (internal citation omitted). The actions taken by Browne and Iosso, immediately following plaintiff's filing of a complaint alleging they violated the LAD, support a reasonable inference there is a causal connection between their actions and plaintiff's protected activity.

In early 2013, Browne issued a RICE notice to plaintiff for reasons that were unexplained at trial. Plaintiff had never received a RICE notice prior to

the filing of his complaint. Although Browne advised plaintiff that defendant would discuss issues related to plaintiff's employment at the public meeting, defendant did not do so. Plaintiff's wife attended the meeting, but defendant did not take any action concerning plaintiff as threatened in the notice. Browne did not testify at trial, and there is no evidence supporting Browne's decision to issue the Rice notice in the first instance.

For twenty-two years prior to May 3, 2013, plaintiff was permitted to use the school patrol vehicle to commute to and from the high school from his home. This was because he was an "on-call" employee who was required to respond to incidents at the school at times outside of his regular workday. On May 3, 2013, that changed when Browne informed plaintiff his use of the vehicle to commute to and from his home was "illegal." Browne informed plaintiff the change was effective immediately and, as a result, the school vehicle plaintiff used to travel to work that day was not available to transport him home.

There is no evidence plaintiff's long-standing use of the vehicle was illegal or that something changed in May 2013 to render illegal his use of the vehicle. During defendant's case, Fano contradicted Browne's explanation to plaintiff about the reason he could no longer use the vehicle. She testified the change was made to promote operation efficiencies, but never stated the change was

41

required because use of the vehicle was illegal. Her testimony permits the reasonable inference that Browne's statement to plaintiff—that his use of the vehicle to commute to and from the school was illegal—was false.

Two-and-one-half weeks later, on May 20, 2013, for the first time in plaintiff's career with defendant, it placed him on a corrective action plan in part for the putative purpose of remedying his use of walkie-talkies to report incidents to the school administration during the school day. Plaintiff, however, testified he had always used walkie-talkies to report incidents and, prior to his receipt of the corrective action plan, he had never been disciplined for doing so or counseled not to do so. Thus, again the reasonable inference is that defendant supported an action affecting plaintiff founded, at least in part, on a falsely stated basis.

Giving plaintiff the benefit of all reasonable inferences, in September 2013, following Ruiz's hire, Ruiz surreptitiously followed plaintiff home in his vehicle. Ruiz denied doing so at trial and, thus, it can be inferred that Ruiz misrepresented that he did not follow plaintiff home. In addition, although plaintiff had served as a security guard at the school for twenty-two years, plaintiff's name was not included among a broadcast of the names of the school's

security guards during the 2013 back-to-school night for the high school's parents and teachers.

In February 2014, Browne issued a second RICE notice, and, at a public meeting, spoke critically of plaintiff's job performance, but no action against plaintiff was taken. At the meeting, Browne publicly stated plaintiff had been placed on a corrective action plan the previous year, and plaintiff had received numerous letters in his personnel following since that time. Plaintiff testified he never violated the corrective action plan, and no letters had been placed in his file after the plan was implemented. In other words, plaintiff testified Browne's public statements about him were false.

In March, Ruiz spoke with plaintiff about retirement and suggested plaintiff could buy back military time and retire earlier. A few weeks later, Ruiz devised a new shift, from 2:00 p.m. to 10:00 p.m., and assigned it to his most senior security officer, plaintiff. There is no evidence any of the Ram guards filed an LAD complaint against defendant, and none of them were assigned to the new shift. Only plaintiff was assigned.

Ruiz testified plaintiff was the most qualified guard for the new shift because of his extensive job experience, but plaintiff explained his experience was unnecessary for the duties assigned. Plaintiff testified his job duties on the

new shift were that of a "watchman," checking the doors and windows of the schools to make sure they were locked.  Plaintiff further detailed that, as a result of the shift change, innumerable other duties he had performed for years were taken from him.

Ruiz's discussions with plaintiff about retirement suggest he wanted plaintiff to leave his position with defendant, but, at the same time, Ruiz testified plaintiff's experience uniquely qualified him to work the new shift.  In other words, Ruiz's statements and actions concerning plaintiff were inconsistent.  In addition, Ruiz's illogical explanation for the assignment of the shift—he assigned plaintiff because of plaintiff's qualifications to a position that required little and eliminated many of the duties plaintiff had vast experience performing in the past—permits the reasonable inference Ruiz's proffered justification was a pretext for an attempt to retaliate against plaintiff for filing a complaint against defendant of which Ruiz was a member and by whom he was employed.  There is no other reason suggested by the evidence for Ruiz's proffer of a pretextual justification for his assignment of plaintiff to the new shift other than he sought to retaliate against the only guard who had filed a complaint against defendant. See Reeves v. Sanderson Plumbing Prods., 530 U.S. 133, 147 (2000) (explaining

a jury may infer intent to discriminate based on circumstantial evidence that proves "the defendant's explanation is unworthy of credence").

Direct evidence is not required to support a finding of causal connection. "[A] finding of the required causal connection may be based solely on circumstantial evidence that the person ultimately responsible for an adverse employment action was aware of an employee's whistle-blowing activity." Maimone, 188 N.J. at 239. For the reasons noted, it can be reasonably inferred Browne, Iosso, and Ruiz—the individuals plaintiff claim retaliated—had knowledge of plaintiff's protected activity. That knowledge, combined with the evidence showing their actions were based misstatements and false or nonexistent justifications for their actions, provides circumstantial proof of the requisite causal connection.

In sum, the totality of the circumstances and evidence presented supported a reasonable inference Browne, Iosso, Ruiz, and defendant took adverse actions against plaintiff in retaliation for the filing of his complaint. We recognize defendant presented evidence that conflicts with plaintiff's version of the events, but we need not address the overall weight of the evidence beyond finding there is at least a scintilla of evidence supporting a reasonable inference there is a causal connection between plaintiff's protected activity and the adverse

employment actions about which he complained. See Dolson, 55 N.J. at 5-6. We therefore reject defendant's claim the court erred by denying its Rule 4:37-2(b) and Rule 4:40-1 motions.

Defendant also argues the court erred by denying his Rule 4:49-1(a) motion for a new trial on his LAD retaliation claims. He claims the motion should have been granted because plaintiff did not present sufficient evidence establishing a retaliatory discharge, and the jury's verdict is therefore against the weight of the evidence.

We review the trial court's decision on a motion for a new trial under the same standard governing the trial judge—whether "it clearly and convincingly appears that there was a miscarriage of justice under the law." Hayes v. Delamotte, 231 N.J. 373, 386 (2018) (quoting R. 4:49-1(a)). "[W]hen evaluating the decision to grant or deny a new trial, 'an appellate court must give "due deference" to the trial court's "feel of the case."'" Ibid. (quoting Risko v. Thompson Muller Auto. Grp., 206 N.J. 506, 522 (2011)).

The trial court found there was sufficient evidence supporting the jury's determination defendant retaliated against plaintiff for his filing of the LAD complaint. Defendant offers no basis to reverse the court's determination, and our independent review of the record confirms the court's findings and

conclusion. "[A]n appellate court has a duty to canvass the record to determine whether a jury verdict was incorrect," but the "verdict should be considered 'impregnable unless so distorted and wrong, in the objective and articulated view of a judge, as to manifest with utmost certainty a plain miscarriage of justice.'" Kassick v. Milwaukee Elec. Tool Corp., 120 N.J. 130, 135 (1990) (quoting Carrino v. Novotny, 78 N.J. 355, 360 (1979)). Defendant makes no such showing here.

C.

We are not persuaded by defendant's argument the jury's award of $150,000 for plaintiff's emotional distress is not supported by the evidence. Defendant claims plaintiff failed to produce any evidence he suffered emotional distress or that any claimed emotional distress was causally related to his employment.

Emotional distress is defined as the suffering of "humiliation, embarrassment and indignity." Tarr v. Ciasulli, 181 N.J. 70, 81 (2004). A plaintiff in a discrimination case "may recover all natural consequences of [the] wrongful conduct, including emotional distress and mental anguish damages arising out of embarrassment, humiliation, and other intangible injuries[,]" without accompanying medical proof necessary to recover for such injuries in a

47

common law personal injury action. Id. at 82. Further, "the Legislature intended victims of discrimination to obtain redress for mental anguish, embarrassment, and the like, without limitation to severe emotional or physical ailments." Id. at 81.

The standard of proof for measuring emotional distress damages in discrimination cases "is 'far less stringent' than for a common law claim of intentional infliction of emotional distress." Klawitter v. City of Trenton, 395 N.J. Super. 302, 335 (App. Div. 2007) (quoting Tarr, 181 N.J. at 82). We view "[a]ll damage[] evidence . . . in the light most favorable to the prevailing party." Ibid.

Our Supreme Court has explained, that "[t]o suffer humiliation, embarrassment and indignity is by definition to suffer emotional distress. Emotional distress actually suffered in that manner by the victim of proscribed discrimination is compensable without corroborative proof, permanency of response, or other physical or psychological symptoms rendering the emotional distress severe or substantial." Tarr, 181 N.J. at 81 (quoting Tarr v. Bob Ciasulli's Mack Auto Mall, Inc., 360 N.J. Super. 265, 276-77 (App. Div. 2003) (Tarr 2)). Thus, past emotional distress can be proven without any expert testimony. Battaglia, 214 N.J. at 518; cf. Lockley v. Turner, 344 N.J. Super. 1,

12 (App. Div. 2001) (noting the jury could not award damages for future emotional suffering and distress because the plaintiff presented no expert testimony to prove permanency).

Plaintiff presented evidence establishing he suffered humiliation, embarrassment, and indignity as a result of defendant's actions. His wife testified to her observations of the changes in his behavior following the filing of his 2012 complaint and subsequent changes to his job duties including, most significantly, the change in his shift and Browne's service of the 2013 and 2014 RICE notices. More particularly, she described that since the filing of his complaint and defendant's actions, he has had difficulty sleeping and has been very emotional, short-tempered, and stressed.

During plaintiff's testimony, he explained he suffered the loss of a "tremendous sense of pride" when Browne informed him that he would no longer change the marquee messages at the high school, was humiliated and embarrassed when he was not identified as one of the high school's security guards, and felt threatened by Iosso during his first meeting with her following the filing of his complaint. As defendant acknowledges, plaintiff testified he felt "isolated" and suffered a loss of his sense of value following the reassignment of his shift and the removal of the many duties he had previously

performed during his career with defendant. He explained Ruiz's implementation of the shift change caused him to fear he would lose his job and his medical benefits, and it interrupted his family life, preventing him from sharing time with his wife during the work week. Plaintiff also explained he felt disrespected by Ruiz's five-day assignment to monitor the sixth-grade boys' bathroom.

Plaintiff's and his wife's testimony sufficiently detailed "humiliation, embarrassment[,] and indignity" that "by definition [is] emotional distress." Tarr, 181 N.J. at 81. Defendant's claims to the contrary ignore the record.

We review a pain and suffering award only "to determine whether it is fair and reasonable." Klawitter, 395 N.J. Super. at 336. In doing so, we recognize "[t]he quantum of compensation . . . is dependent upon . . . duration of the discriminatory conduct, its public nature, and its content and may be enhanced by such additional proofs of indicia of suffering as plaintiff may adduce." Tarr, 181 N.J. at 81 (quoting Tarr 2, 360 N.J. Super. at 276-77).

The jury was properly instructed to assess plaintiff's damages, and it awarded plaintiff $150,000 for the emotional distress he suffered during the almost five-year period following the filing of his complaint. Defendant's retaliatory assignment to the 2:00 p.m. to 10:00 p.m. shift continued for years

following its implementation in 2014, and the jury could reasonably conclude plaintiff continued to suffer from the interruption of his ability to see his wife during the work week. As the Court explained in Cuevas v. Wentworth Group, "[t]he Legislature understood the psychological toll that discrimination may have on victims," 226 N.J. 480, 511 (2016), including "career . . . family and social disruption," ibid. (quoting N.J.S.A. 10:5-3).

Additionally, plaintiff worked as a public employee in a public environment. His exclusion from the roster of security guards, Browne's issuance of RICE notices, discussion of plaintiff's job performance at a public meeting, and the removal of plaintiff's numerous job duties and reassignment to the 2:00 p.m. to 10:00 p.m. shift were all of a public nature. Tarr, 181 N.J. at 81.

Defendant also claims the court erred by allowing Dr. Miller to testify before the jury following a N.J.R.E. 104 hearing, and then striking Dr. Miller's testimony. We reject defendant's assertion for two reasons. The court instructed the jury to disregard Dr. Miller's testimony in its entirety, and we presume the jury followed that direction absent evidence demonstrating otherwise. See State v. Loftin, 146 N.J. 295, 390 (1996). Defendant points to no such evidence here.

We appreciate the jury's award was not insignificant, but "a certain amount of imprecision is acceptable" in a jury's award of pain and suffering damages "as long as it appears that the damage award was not based upon speculation, passion, or prejudice." Klawitter, 395 N.J. Super. at 336. There is no evidence the jury's award was founded on an impermissible basis, and, given the evidence, we discern no reason to conclude the verdict is either unfair or unreasonable. We are unconvinced, as was the trial judge, that the award is "so disproportionate to the injury as to shock the conscience." Rendine v. Pantzer, 141 N.J. 292, 312 (1995) (citing Baxter v. Fairmont Food Co., 74 N.J. 588, 596-97 (1977)).

For essentially the same reasons, we reject defendant's claim the court erred by denying its request for remittitur. "[A] jury's award of damages is presumed to be correct . . . [and] a court must view" a motion for remittitur and the evidence "in the light most favorable to the plaintiff." Cuevas, 226 N.J. at 501. We review a damages award employing the same standard as the trial court, "with one exception—an appellate court must pay some deference to a trial judge's 'feel of the case.'" Ibid. (quoting Johnson v. Scaccetti, 192 N.J. 256, 282 (2007)).

While acknowledging courts have granted remittitur in LAD cases, in Cuevas the Court also noted caselaw upholding "high emotional-distress LAD awards, even in the absence of expert testimony." Id. at 508. The Court explained "[t]he realization that a wide range of potential awards is permissible counsels for judicial restraint[,]" and "[t]hat is why the remittitur standard is set so high." Id. at 509. The Court determined "the instances in which a remittitur should be granted will be glaring and obvious from the record." Ibid.

Here, the court considered the evidence submitted, the course of the retaliatory conduct, and the length of time plaintiff was the victim of the conduct and suffered from its ongoing effects. As the court recognized, the damage award was on the high end of what might it expected, but "we cannot say that [it was] so 'wide of the mark,' so 'pervaded by a sense of wrongness,' so 'manifestly unjust to sustain,' that [it] shock[s] the judicial conscience." Id. at 513; see also Orientale v. Jennings, 239 N.J. 569, 595-96 (2019). The court therefore correctly denied defendant's motion for a remittitur.

D.

We next address plaintiff's argument the court erred by dismissing his punitive damages claim following the jury's determination defendant retaliated against him for filing his 2012 complaint. The trial court dismissed the claim

for two reasons. It found plaintiff could not prove by "clear and convincing evidence" that the retaliation was "especially egregious" and there was insufficient evidence showing that at least one upper management employee "actually participated in or was willfully indifferent to the wrongful conduct."

Punitive damages under the LAD are governed by N.J.S.A. 10:5-3, which authorizes the award of punitive damages for an LAD violation, and New Jersey's Punitive Damages Act, N.J.S.A. 2A:15-5.9 to -5.17. There are two essential prerequisites to an award of punitive damages under the LAD: proof of actual participation of upper management or willful indifference; and proof that the conduct was especially egregious. Quinlan v. Curtiss-Wright Corp., 204 N.J. 239, 274 (2010).

Determining if an employee is a member of upper management is a "fact-sensitive" task, Cavuoti v. N.J. Transit Corp., 161 N.J. 107, 122 (1999), requiring a finding "the employees who acted wrongfully must have had sufficient authority to make the imposition of punitive damages fair and reasonable," id. at 128. The Court has explained that to be "a member of 'upper management,' the employee should have either (1) broad supervisory powers over the involved employee[], including the power to hire, fire, promote, and

discipline, or (2) the delegated responsibility to execute the employer's policies to ensure a safe, productive[,] and discrimination-free workplace." Id. at 129.

The Court has also defined the standard for finding the "especially egregious behavior" that must be proven to establish an entitlement to punitive damages. In Quinlan, the Court

> described the test for egregiousness as being satisfied if plaintiff has proven "an intentional wrongdoing in the sense of an 'evil-minded act' or an act accompanied by a wanton and willful disregard for the rights of [plaintiff]." In the alternative, we have found that the evidence will suffice if it demonstrates that defendant acted with "actual malice."
>
> [204 N.J. at 274 (internal citations omitted).]

Plaintiff makes a limited and focused argument challenging the court's dismissal of his punitive damages claim. He argues the court erred by dismissing his punitive damages claims because there was "actual participation and willful indifference by upper management." More specifically, he contends the court erred by finding Iosso and Ruiz were not part of defendant's upper management.

Plaintiff does not point to any evidence establishing Ruiz was a member of defendant's upper management. To be sure, he was a supervisor of five security guards, but beyond that there is no evidence he had the power to hire,

fire, promote, or discipline plaintiff or any other of defendant's employees. There is similarly no evidence Ruiz was delegated the responsibility to implement defendant's anti-discrimination policies. If Ruiz had any such authority, plaintiff failed to present evidence of such.

The same is not true of Iosso. There was evidence Iosso was vested with broad authority over plaintiff, including the authority to determine if his employment would continue from year to year. Plaintiff testified that in September 2012, he met with Iosso and she would use his performance evaluations to determine if he would be retained or let go at the end of the year. In other words, Iosso declared she had the authority to decide whether plaintiff's employment would be terminated at the end of his contract year.

In addition, although plaintiff does not mention Browne in his argument, the evidence showed that as superintendent he had authority over plaintiff's employment. Indeed, he was employed as the school district's superintendent, acted as defendant's representative in authoring the RICE notices to plaintiff, and publicly discussed, as defendant's representative, plaintiff's performance at a BOE meeting.

Although we are convinced there was sufficient evidence supporting a finding Browne and Iosso were part of defendant's upper management, we affirm

the court's dismissal of the punitive damages claim because plaintiff does not argue the court erred by finding insufficient evidence to support a claim Browne, Iosso, or Ruiz engaged in the especially egregious conduct that is a requisite to an award of punitive damages, <u>Quinlan</u>, 204 N.J. at 274, and he does not point to any evidence supporting such a claim.[13] An argument not briefed on appeal is deemed waived. <u>Drinker Biddle & Reath LLP v. N.J. Dep't of Law & Pub. Safety, Div. of Law</u>, 421 N.J. Super. 489, 496 n.5 (App. Div. 2011).

E.

Defendant appeals from the court's attorney fee award, and plaintiff cross-appeals from the award. Defendant argues plaintiff is not entitled to an attorney fee award because his counsel submitted a false certification and affidavit detailing the hours allegedly devoted to plaintiff's case. In the alternative, defendant argues the court erred in determining the amount of the award. On the other hand, plaintiff contends the court erred by calculating the amount of the award.

---

[13] In plaintiff's brief, his argument focuses exclusively on the court's finding Ruiz and Iosso were not part of upper management. He includes a vague and confusing statement that "[t]he jury heard testimony that they could have concluded was intentionally meant to cause harm and force an early retirement," but it is untethered to any citation to the record. Plaintiff never argues the court erred by finding a lack of evidence supporting a finding of especially egregious conduct as defined by the Court in <u>Quinlan</u>, 204 N.J. at 274.

As the prevailing party in this matter, plaintiff was entitled to an award of reasonable counsel fees and costs. N.J.S.A. 10:5-27.1. Obtaining such an award, however, is not self-executing. The party requesting an attorney fee award has the burden of proving the request is reasonable. Blakey v. Cont'l Airlines, Inc., 2 F. Supp. 2d 598, 602 (D.N.J. 1998).

The starting point for an attorney fee award is the "lodestar" amount, or the number of hours reasonably expended on the litigation multiplied by a reasonable hourly rate. Walker v. Giuffre, 209 N.J. 124, 130 (2012); Rendine, 141 N.J. at 335. "The use of contemporaneously recorded time records is the preferred practice to verify hours expended by counsel in connection with a counsel-fee application." Szczepanski v. Newcomb Med. Ctr., Inc., 141 N.J. 346, 367 (1995). The Court has explained that in determining the number of hours "we . . . assume that applications for counsel fees invariably would be accompanied by contemporaneously recorded time records that fully support the calculation of hours expended" by the attorneys for whom the fee award is sought. Ibid. "[R]eliance on reconstructed records is strongly disfavored," but may be permitted in "exceptional circumstance[s]." Id. at 367-68. A trial court may properly "exercise its discretion to exclude from the lodestar calculation hours for which counsel's documentary support is marginal." Id. at 368.

As detailed by the trial court, and as reflected in the record, plaintiff's counsel first represented that he spent 971.4 hours working on plaintiff's matter during its six-year history, and an additional 334.3 hours were spent by paralegals and other counsel. Plaintiff's counsel attached to his supporting certification a list of entries detailing the services allegedly performed and the time spent on each. He also sought a $550 hourly rate.

It was later revealed that plaintiff's counsel did not keep any time records for the services he allegedly provided during the case, none of the entries were based on contemporaneous time records, and the entries were allegedly reconstructed by plaintiff's counsel. Plaintiff's counsel then submitted a supplemental affidavit, reduced the number of hours he claimed he spent to 662.6, reduced the number of hours claimed for services provided by paralegals and other attorneys from 333.4 to 158.4, and reduced the hourly fee sought to $425. The revisions made in the supplemental affidavit reduced the fee request from $602,404 to $280,570.

We agree with the trial court that plaintiff's counsel's submission of the initial certification was misleading because it was "presented to the [c]ourt and counsel in a way that it appeared to be based on contemporaneous time records kept from 2012 to 2017." The record also supports the court's determination

that plaintiff's counsel's original certification "is totally unreliable and untrustworthy," and the revisions in his supplemental affidavit are "similarly unreliable . . . as it appears that they were created just to arrive at a more reasonable bottom line and do not reflect the actual time devoted to any tasks in the case."

The court concluded plaintiff's counsel's certification and supplemental affidavit were untrustworthy and unreliable. We agree. Plaintiff's counsel's original certification was clearly misleading and intended to suggest that contemporaneous time records were maintained. Entries going back many years were parsed to tenths of an hour, and, as pointed out by defendant, the entries included hours spent at a court proceeding that was scheduled but never occurred because plaintiff's counsel requested that it be adjourned.

As recognized by the trial court, the supplemental affidavit did not make things better. It undermined any semblance of reliability of plaintiff's counsel's representations because it did not provide any evidence supporting the alleged time spent on various tasks. Instead, the supplemental affidavit showed only unexplained reductions in the time entries made in an apparent effort to make the unsupported entries appear more reasonable. What plaintiff's counsel missed then, and misses again on appeal, is that before the court could properly consider

whether the alleged time spent on a task was reasonable, it had to determine if the task was performed at all.[14]

The LAD's fee-shifting provision serves important purposes. It "address[es] the 'problem of unequal access to the courts,'" Walker, 209 N.J. at 129 (citation omitted); provides access to the courts for an individual aggrieved by an LAD violation; encourages adequate representation to ensure enforcement of the LAD; and deters violations of the LAD, ibid. The achievement of those purposes, however, does not give license to counsel for a prevailing party to seek fees based on sworn submissions that are both misleading and wholly unreliable. A proper award of a fee cannot be the result of gamesmanship where a counsel lacking any credible records asks for a clearly exorbitant fee with the hope of getting a compromise award unsupported by any credible evidence of claimed tasks that were not performed in the first instance. That is what plaintiff's counsel attempted here.

To fill the void left by plaintiff's counsel's untrustworthy and unreliable submissions, the court generally identified the tasks plaintiff's counsel

---

[14] The record reflects plaintiff's counsel did not serve any discovery demands during the case and did not take any depositions. The case was also dismissed for lengthy periods of time due to plaintiff's discovery violations. The case was dismissed for seven months in 2013 and ten months during 2014 and 2015 due to plaintiff's discovery violations. Plaintiff called only four witnesses at trial.

performed during the case and then allocated what the court found was a reasonable number of hours to each task. More particularly, the court made the following findings and allocation of hours:

> Client conferences and document review - 20 hours; legal research - 10 hours; preparation of complaint and amended [c]omplaint - 7 hours; pretrial discovery []22 hours; prepare for and attend [c]ourt ordered arbitration - 5 hours; attendance at calendar calls - 7 hours; opposing summary judgment - 25 hours; preparation for trial - 25 hours; attendance at trial and daily preparation - 70 hours; post-trial opposition to motions - 10 hours. Total - 201 hours[.]

It was on that basis the court determined the number of hours, 201, it used to calculate the lodestar.

We are loathe to reward plaintiff's counsel's actions in the submission of the fee application, but we cannot conclude the court abused its discretion in making its finding of a calculation. See Rendine, 141 N.J. at 317 (stating "expectation" that appellate courts will disturb a trial court's attorney's fee determination "only on the rarest occasions, and then only because of a clear abuse of discretion"). That is because the court surgically determined the tasks about which there could be no dispute plaintiff's counsel provided and allocated only what it determined were a reasonable number of hours to each. For example, there is no dispute plaintiff's counsel prepared a complaint and

amended complaint, attended an arbitration, responded to discovery demands, opposed defendant's motion for summary judgment, attended calendar calls, and prepared for and attended the trial.

Moreover, it can be reasonably inferred plaintiff's counsel spent at least twenty hours conferring with his client during the almost five years the case was pending. Thus, putting the unreliability and untrustworthiness of plaintiff's counsel's certification aside, the court's finding plaintiff's counsel performed the tasks is independently well supported, and we therefore find no abuse of discretion in the court's determination of the number of hours plaintiff devoted to each.[15]

We also find no abuse of discretion in its determination that plaintiff's counsel's hourly rate should be $350. The court detailed its reasons for that determination, and we discern no basis to reverse the court's conclusion. We

---

[15] We do not suggest a court confronted with the problems presented by plaintiff's supporting certification and affidavit is obliged to sift through the record and determine the tasks the record shows were actually performed. It is the prevailing party's burden to establish the time spent on a matter and the reasonable rate required to calculate the lodestar. Here, the court chose to identify the tasks plaintiff's counsel clearly performed independent of the time allocated to each in plaintiff's counsel's certification and supplemental affidavit. We therefore decide only that the court's findings are supported by the record, and its reliance on plaintiff's counsel's performance of the identified tasks was properly considered in determining the lodestar.

therefore find the court correctly determined the lodestar, and we reject defendant's claim to the contrary. Plaintiff's arguments in support of his cross-appeal, that the court erred in its determination of the attorney's fee award and assessing costs, are without sufficient merit to warrant discussion in a written opinion. R. 2:11-2(e)(1)(E).

We have considered all the arguments made by the parties, and any arguments we have not expressly addressed are without sufficient merit to warrant discussion. R. 2:11-2(e)(1)(E).

Affirmed.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION

A-2274-17T4